# In the United States Court of Federal Claims

No. 18-1595C

(Filed Under Seal: February 1, 2019)

(Reissued: February 11, 2019)

| | | |
|---|---|---|
| **ATSC AVIATION, LLC,** | ) | Pre-award challenge in post-award |
| | ) | circumstances; exclusion from the |
| **Plaintiff,** | ) | competitive range; standing; competitive |
| | ) | range determination; evaluations of |
| **v.** | ) | offers by procuring agency |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **PINNACLE SOLUTIONS, INC.,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |

David Y. Yang, Oles Morrison Rinker & Baker LLP, Seattle, WA, for plaintiff.  Of counsel was Erich C. Potter and Daniel P. Radthorne, Oles Morrison Rinker & Baker LLP, Seattle, WA.

Zachary J. Sullivan, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel were Major Felix S. Mason, Trial Attorney, Contract & Fiscal Law Division, U.S. Army Legal Services Agency, Fort Belvoir, VA, and Debra J. Talley, Associate Command Counsel, and Andy K. Hughes, Attorney-Advisor, U.S. Army Material Command, Redstone Arsenal, AL.

Aron C. Beezley, Bradley Arant Boult Cummings LLP, Washington, D.C., for defendant-intervenor.  Of counsel were Patrick R. Quigley and Sarah S. Osborne, Bradley Arant Boult Cummings LLP, Washington, D.C.

## OPINION AND ORDER[1]

_____

[1]Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review this decision and provide proposed redactions of any

LETTOW, Senior Judge.

Plaintiff ATSC Aviation, LLC ("ATSC") protests its exclusion by the U.S. Army Contracting Command Redstone Arsenal ("Army") from the competitive range and the subsequent award to other offerors of a contract valued at up to approximately $25.5 billion. The procurement called for multiple awards of indefinite delivery/indefinite quantity fixed-price contracts to provide the Army with worldwide logistical support services for non-standard rotary-wing aircraft. ATSC was one of ten initial offerors, and the only offeror excluded from the competitive range.[2] Eight of the nine remaining offerors submitted timely final proposals, all eight of whom subsequently received a contract award. ATSC requests that this court declare as unreasonable the Army's evaluation of ATSC's proposal and exclusion from the competitive range, compel the Army to enter into discussions with ATSC, and allow ATSC to submit a revised proposal. Compl. at 16. ATSC further asks this court to declare that the Army should add ATSC to those awarded the contract. Compl. at 16.

ATSC alleges that the Army committed procurement error when the Army: (1) rated ATSC's proposal as "marginal" under both a Technical factor, Compl. ¶¶ 38-42, and a Small Business Participation factor, Compl. ¶¶ 53-57; (2) assigned ATSC a "neutral confidence" performance rating under the Past Performance factor and then used the neutral confidence rating as a ground for exclusion contrary to the solicitation's evaluation scheme, Compl. ¶¶ 43-52; and, (3) excluded ATSC from the competitive range despite ATSC's offer of a price lower than all of the eight awardees, basing its decision "on a blanket comparison of offerors' non-price ratings [without] consider[ing] ATSC's substantial price advantage," Compl. ¶¶ 58-62. ATSC elaborates that the Army established a flawed competitive range because, "despite its pretextual assertions, the [Army] did not actually care about offerors' nonprice ratings in determining who should get a contract." Pl.'s Resp. to [Def.'s Mot. to Dismiss & Cross-Mot. & Def.-Intervenor's Cross-Mot.] ("Pl.'s Reply"), at 5, ECF No. 33.

ATSC filed its motion for judgment on the administrative record on November 14, 2018.[3] The United States ("the government") coupled its opposition to the plaintiff's motion for judgment with a motion to dismiss and, in the alternative, a cross-motion for judgment on the administrative record. Def.'s Mot. to Dismiss or, in the Alternative, Cross-Mot. for Judgment

---

confidential or proprietary information. The resulting redactions are shown by brackets enclosing asterisks, i.e., "[***]."

[2]ATSC alleges it has had experience with the work to be done under the procurement, having provided services to the Army's Non-Standard Rotary Wing Aircraft Project Management Office for nine years. See Pl.'s Mot. for Judgment on the Admin. Record (Pl.'s Mot.") at 1, ECF No. 26; see also AR 11e-2279 to 80 (ATSC's Past Performance Volume, showing two recent non-standard rotary-wing contracts).

[3]The government filed the administrative record on October 30, 2018, ECF No. 23. It is consecutively paginated, divided into more than 800 tabs and subtabs, and consists of more than 18,000 pages. Citations to the record are cited by tab and page as "AR ___ - ___." The record was supplemented by consent twice, on November 19, 2018, ECF Nos. 25 & 28, and December 14, 2018, ECF Nos. 32 & 34.

upon the Admin. Record & Opp'n to Pl.'s Mot. for Judgment upon the Admin. Record ("Def.'s Cross-Mot."), ECF No. 31.  Pinnacle Solutions, Inc. ("Pinnacle"), one of the eight awardees, having been permitted to intervene, filed a cross-motion for judgment on the administrative record and an opposition to ATSC's motion for judgment.  Def.-Intervenor Pinnacle Solutions, Inc.'s Cross-Mot. for Judgment on the Admin. Record & Resp. to Pl.'s Mot. for Judgment on the Admin. Record ("Def.-Intervenor's Cross-Mot."), ECF No. 30.

After the parties filed replies, *see* Pl.'s Reply; Def.-Intervenor Pinnacle Solutions, Inc.'s Reply in Support of its Cross-Mot. for Judgment on the Admin. Record ("Def.-Intervenor's Reply"), ECF No. 35; Def.'s Reply in Support of [Def.'s Cross-Mot.] ("Def.'s Reply"), ECF No. 36, the court held a hearing on the competing motions on January 3, 2018.

The court concludes that ATSC's protest is timely and within this court's jurisdiction.  The government's motion to dismiss is therefore denied.  The court further finds that ATSC's contentions of error in the procurement lack merit.  Accordingly, ATSC's motion for judgment on the administrative record is denied, and the government's and Pinnacle's cross-motions for judgment are granted.

## FACTS[4]

### A. *The Army's Solicitation for Non-Standard Rotary-Wing Logistics Support Services*

On August 18, 2017, the Army issued a negotiated request for proposal (the "solicitation") for logistical support services to support non-standard rotary-wing aircraft worldwide.  AR 6-775 to 76.  The contractor would provide assorted engineering, maintenance, training, and infrastructure support services to various classifications of helicopters used by the U.S. military or friendly countries.  AR 6-799 to 800.  Offers were due by September 28, 2017. AR 8-1521.[5]

The solicitation specified multiple award indefinite delivery/indefinite quantity fixed-price contracts, to be competed on a full and open basis.  AR 6-776.  The base contract would contain all contractual clauses and provide a framework for subsequent specific logistical services, which would be issued as task orders.  AR 6-799.  Those awarded a contract would be eligible to compete for task orders.  AR 6-776.  Task orders would be divided into two pools, one of which was restricted to small businesses.  AR 6-776.

The solicitation specified a five-year base period followed by a five-year option.  AR 6-776, 797.  The cost ceiling over the life of the contract was $25.5 billion, but each awardee

---

[4]The recitations that follow constitute findings of fact by the court from the administrative record of the procurement filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC").  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[5]The original deadline was September 18, 2017.  Amendment 0002 extended the deadline. *Compare* AR 6-775, *with* AR 8-1521.

would only be guaranteed a minimum order of $2,000.  AR 6-776.  The Army could award many, one, or no contracts per pool, but intended to award "two or more prime contracts" per pool.  AR 6-919; AR 10-1921.

Because the actual services would be issued by task order, the solicitation provided a hypothetical "Sample Task Order" upon which offerors were to base parts of their proposal.  AR 6-919 to 21.  The Sample Task Order was provided as Attachment 15 to the solicitation and requested hypothetical logistical support for Mi-17 and MD-530F helicopters for the Afghan military for a period of five years, consisting of a one-year base period and four one-year option periods.  *See* AR 6-1275 to 77.  The Sample Task Order specified a fleet of 27 MD-530F helicopters and 50 Mi-17 helicopters operating at a total of 11,700 and 15,000 hours, respectively, with mission availability rates of 90% and 75%, respectively.  AR 6-1280.  Work would occur in Afghanistan at three primary sites and at least two secondary sites.  AR 7-1443. The Sample Task Order also required developing various operational, maintenance, management, and security plans, plus maintaining a hazardous materials collection site, and conducting specified reviews and meetings with government representatives.  AR 6-1281 to 89.

Shortly after issuance, the Army amended the solicitation three times, on September 1, 2017 (Amendment 0001), September 14, 2007 (Amendment 0002), and September 25, 2017 (Amendment 0003).  *See* AR 7-1389; AR 8-1521; AR 9-1741.  Substantive changes resulting from Amendment 0001 included updating the Sample Task Order to reflect a performance start date of December 1, 2018, AR 7-1428, clarifying the Sample Task Order's primary work locations and the number and type of aircraft at the locations, AR 7-1434, 1443, 1515, and specifying additional information to be provided by the offerors when completing the small business participation plan, AR 7-1391.  Amendment 0001 also included 27 questions submitted by industry through August 29, 2017, along with the Army's responses.  AR 7-1516 to 20. Amendment 0002 extended the proposal due date to September 28, 2017, AR 8-1521 to 22, and made other changes immaterial to this protest, AR 8-1522 to 24.  Amendment 0003 set out 61 additional industry questions received after August 29, 2017, and the Army's answers, but changes to the solicitation were not pertinent to this protest.  *See* AR 9-1742 to 43 (list of changes), 1847 to 60 (industry questions).

## B.  *Evaluation Process & Factors*

Prior to issuing the solicitation, the Army developed a Services Acquisition Strategy, AR 2-6, an Acquisition Plan, AR 4a-583, and a Source Selection Plan, AR 5b-725.  Although not part of the solicitation, these documents provided internal guidance for the selection process. The Source Selection Plan, as amended, established, among other things, the selection team and the evaluation process.  *See* AR 5b-728.  The Source Selection Plan organized a tiered Source Selection Team to evaluate proposals and determine contract award.  AR 5b-731.  The Source Selection Authority ("Selection Authority"), among other responsibilities, would make the ultimate determination of which proposal represented best value, based on the proposals and recommendations from an Source Selection Advisory Council ("Advisory Council") and a Source Selection Evaluation Board ("Evaluation Board").  AR 5b-738 to 39; *see also* 2n-362 to 63, 375; 48 C.F.R ("FAR") § 15.308 (discussing the basis for the Selection Authority's

decision).[6]  The Selection Authority also would appoint the chairpersons of the Advisory Council and Evaluation Board and oversee their operation.  *See* Department of Defense, Source Selection Procedures at 7 (Mar. 31, 2016) ("DoD Source Selection Procedures") (discussing the role of the Selection Authority, incorporated by reference by AR 5b-731); *see also* AR 2n-362.

The Evaluation Board was to conduct "a comprehensive review and evaluation of proposals" against solicitation requirements and provide its report to the Advisory Council.  DoD Source Selection Procedures at 12-13 (discussing the role of the Evaluation Board, incorporated by reference by AR 5b-731); *see also* AR 5b-737; AR 2n-364 to 66.  The Advisory Council would "provide a written comparative analysis of offers and recommendation to the [Selection Authority]."  DoD Source Selection Procedures at 9-10 (discussing the role of the Advisory Council, incorporated by reference by AR 5b-731); *see also* AR 5b-738 (The Advisory Council conducts a "tradeoff analysis among the competing proposals."); AR 2n-364 (The Advisory Council would "assess which proposal represents the best value as defined in the [solicitation]," using its own expertise and the Evaluation Board's findings.).  The Source Selection Plan directed use of adjectival ratings for the non-price factors, AR 5b-732, but noted that these ratings "are merely labels and not the sole basis for proposal comparison," AR 5b-738.  Adjectival ratings would be supported by examining proposals for significant strengths, strengths, uncertainties, weaknesses, significant weaknesses, deficiencies, or adverse past performance.  AR 5b-735 to 36.  Weaknesses and significant weaknesses represented flaws that increased the risk of non-performance whereas deficiencies represented unacceptable risks of non-performance.  AR 5b-735 to 36.

The solicitation specified that each proposal must contain six volumes: (I) Entry Gate Criteria; (II) Technical; (III) Past Performance; (IV) Price; (V) Contract Documentation; and (VI) Small Business Participation.  AR 6-910 to 15.  These volumes corresponded to the evaluation approach, which in accord with the solicitation required the Army to evaluate each offer in a two-step process.  In Step 1, the Army reviewed the three Entry Gate Criteria on an Acceptable / Unacceptable basis.  The Entry Gate Criteria required the offeror to hold an AS 9100 quality assurance certification, the offeror and proposed key subcontractors[7] to submit evidence of technical experience involving rotary-wing logistical support services provided outside the continental United States, and the offeror to identify and provide resumes for specified key personnel, meeting specified educational and professional criteria.  AR 6-910, 919 to 20; AR 10-1921 to 22.  An Acceptable rating required satisfying each of the three criteria and was necessary for the Army to further consider the offeror's proposal.  AR 6-919; AR 10-1922.

Offerors who satisfied the Entry Gate Criteria moved to Step 2, which required the Source Selection Team to evaluate each proposal using a "best value trade off," based on the four factors listed in the solicitation: Technical, Past Performance, Price, and Small Business Participation.  AR 6-919 to 20; AR 10-1922.  The solicitation specified that the Technical and

---

[6]The Source Selection Team also included a Procuring Contracting Officer, who "serve[d] as the primary business advisor and principal guidance source."  AR 2n-366; *see also* AR 5b-731, 743.

[7]A key subcontractor would be one that "perform[ed] or provide[ed] 20 percent or more of the proposed task order labor or material values."  AR 6-802.

Past Performance factors were of equal weight, and were each "slightly more important" than Price, which was "more important" than Small Business Participation. AR 6-919; AR 10-1921. The non-price factors combined were "significantly more important than Price." AR 6-919; AR 10-1921.

The Army intended to "evaluate proposals and award a contract without discussions with offerors." AR 6-921. If the Army did decide to hold discussions, it would first establish a competitive range. AR 6-921.

### 1. Technical factor.

The Technical volume required offerors to "present a clear and concise description of its proposed approach for meeting requirements . . . , as well as the risks of cost, schedule, and performance in its approach." AR 6-910. Each offeror was to "explain the actual methodology it will use" in completing requirements, all of which were mandatory, and to "specifically address the rationale for each approach." AR 6-910. Key elements consisted of a Skill Classification Crosswalk and the offeror's Technical Approach. AR 6-910. The Crosswalk required offerors to complete a skills classification spreadsheet provided as Attachment 0009 of the solicitation, AR 6-910 to 11, which matched the offeror's labor categories to the government's labor categories, AR 6-946. The Technical Approach required offerors to provide three specified plans. Offerors were to provide a "Contract Management Plan" that identified three to five risks each for supplying and maintaining rotary-wing aircraft supply and maintenance in a location outside the continental United States, along with risk mitigation strategies. AR 6-911. The Contract Management Plan also had to "address[] in sufficient detail the offeror's plan to meet the requirements defined by [the solicitation's performance work statement]," AR 6-911, which included requirements such as developing safety, security, and quality assurance procedures, *see, e.g.*, AR 6-803 to 04, as well as providing the logistical services required by the contract, *see, e.g.*, AR 6-807 to 11. Offerors were also to provide a "Risk Management Plan" and a "Task Order Management Plan" specific to executing the Sample Task Order. AR 6-911; *see also* AR 6-1285 to 86 (containing Sample Task Order requirements for the Task Order and Risk Management Plans). The Risk Management Plan required the contractor to "identify, analyze, mitigate, and track associated program risks to the [Sample Task Order]" and to prepare a "Risk Management Status Report." AR 6-1286. The Task Order Management Plan required offerors to provide an organization chart and roster of specified key personnel, a description of organization and personnel responsibilities, an estimate of hours for certain program management personnel, as well as plans to manage subcontractors, small business participation, data, and compliance with arms trafficking regulations. AR 6-1285 to 86.

The technical evaluation would examine the appropriateness of the Skill Classification Crosswalk and whether the offeror understood the requirements and risks of contract performance based on the Contract Management, Risk Management, and Task Order Management plans. AR 6-920; AR 10-1922. Per the Source Selection Plan, the Evaluation Board would evaluate the technical factor using five adjectival ratings: Outstanding, Good, Acceptable, Marginal, and Unacceptable. AR 56-732 to 33. The technical assessment would include a separate technical risk rating of Low, Moderate, High, or Unacceptable. AR 5b-733. High risk would likely result in a Marginal technical rating while Unacceptable risk would result in an Unacceptable Technical rating and make the proposal ineligible for award. AR 5b-733.

    2.   *Past Performance factor.*

    The Past Performance volume required offerors to submit three contracts of similar scope of work performed by the offeror and one contract for each proposed key subcontractor, all performed within the three years preceding the solicitation. AR 6-911. Offerors were also to include letters of commitment for all key subcontractors. AR 6-911. For each identified contract, the offeror was to e-mail a Past Performance Risk Assessment Questionnaire ("Past Performance Questionnaire") to both the government contracting activity and the technical representative for the contract, with a request for each to complete the Questionnaire and return it to the Army. AR 6-913. Additionally, the Army reserved the right to use "information other than that provided by the Offeror." AR 6-920.

    Past Performance would be evaluated to "determine recency, relevancy, and the confidence the [g]overnment has that the contract[ual] technical, schedule, and performance parameters will be met." AR 6-920; AR 10-1922. Individual projects and combined past performance would be assessed for relevancy, which would inform the confidence rating. AR 5b-733 to 34. Relevancy would be denoted as Very Relevant, Relevant, Somewhat Relevant, or Not Relevant. AR 5b-734. The Army would also assess an overall confidence rating. AR 6-920; AR 10-1922. The Evaluation Board would use five adjectival ratings to evaluate confidence: Substantial, Satisfactory, Neutral, Limited, and No Confidence. AR 5b-734. A Neutral confidence rating would not result in either an unfavorable or favorable past performance evaluation. AR 5b-734; *see also* FAR § 15.305(a)(2)(iii) (requirements on evaluating past performance).

    3.   *Price factor.*

    The Price volume required offerors to complete a labor rate table set out as Attachment 0010 of the solicitation and to provide narrative information regarding its cost estimation process and the compliance status of its purchasing and accounting systems. AR 6-913 to 15. Labor rates provided by offerors would serve as "ceiling rates" for contractors when proposing costs for future task orders. For performance outside Iraq or Afghanistan, contractors would be allowed to propose adjustments to labor rates. AR 6-830. Offerors did not bid on contract performance or on performance of the hypothetical Sample Task Order, AR 6-919. Instead, the Army computed price using the hourly proposed labor ceiling rates for each labor category for each of the 10 years, as those rates appeared in each offeror's labor rate table. *See, e.g.*, AR 6-920 to 21; AR 10-1922.

    The proposed labor rate table would be evaluated for "fairness, reasonableness, compliance, completeness, and errors," and the Army would also assess whether offerors possessed an adequate accounting system. AR 6-920. A fair and reasonable price would represent one that a "prudent person would pay in the conduct of a competitive business." AR 6-920. The Army would also compare proposed labor rates to the applicable minimum wage and benefits for each labor category. AR 6-921. Completeness required compliance with submission instructions and the ability to match the price proposal to the labor category. AR 6-921. Amendment 0004, issued after the Army established the competitive range, specified that the proposed labor rate table would be evaluated only for "fairness, reasonableness, and

compliance," using the same definitions as specified in the original solicitation. *Compare* AR 10-1922, *with* AR 6-920. Amendment 0004 also included a warning that failure to propose a ceiling rate for any labor category for any year would render the offeror ineligible for award. AR 10-1922.

> *4. Small Business Participation factor.*

The solicitation's performance work statement required "[c]ontractors [to] make a good faith effort to find opportunities for small business suppliers and service providers in the performance of this work effort," and provided the "Army's [s]ubcontracting goals" for various socioeconomic classifications. AR 6-806; AR 10-1876. The goals included a 35% target for small businesses, based on the value of subcontracted work relative to the overall value. AR 6-806; AR 10-1876.

The Small Business Participation volume required all offerors to submit a Small Business Participation Plan based on executing the Sample Task Order. AR 6-915. The plan required the offeror to "identify the proposed dollar value and percentage of anticipated awards to small business." AR 6-915. Offerors were to identify each small business they would use as subcontractors and its socioeconomic classification, and include a "specific and detailed" description of work for which each would be used, the extent and type of commitments to small business subcontractors, and the offeror's plan to manage and oversee subcontractors. AR 6-916 to 17. Offerors were required to provide documentation of commitments to subcontractors and were directed to provide copies of teaming agreements that defined subcontractor work. AR 6-916. Teaming agreements would not count against the page limit for this volume. AR 6-916.

In contrast to the Army's small business participation goals, the evaluation factor contained "no minimum Small Business Participation goal," but the solicitation advised offerors to propose their best effort because it was "a competitive requirement." AR 6-916; AR 10-1918. Small business participation would be evaluated on the effort proposed for small businesses, the various socioeconomic classifications used, the firmness of subcontracting commitments, identification of the complexity and variety of the work to be performed by small business, the extent of management and oversight of subcontractors, and evidence of past use of small businesses. AR 6-915 to 16, 921; AR 10-1922 to 23. A small business offeror's own participation would also be considered small business participation. AR 6-915.

In evaluating participation by small businesses, the Evaluation Board would use five adjectival ratings: Outstanding, Good, Acceptable, Marginal, and Unacceptable. AR 5b-735.

### C. *Army's Initial Evaluation of Proposals & Initial Award Decision*

The Army received 10 timely offers, denoted as C-1 through C-10 to permit a blind review of proposals. *See* AR 16-2810. ATSC was offeror C-4 and Pinnacle was C-10. *See* AR 16-2810. Four offerors qualified for the pool restricted to small businesses: C-3, ATSC, C-8, and Pinnacle. *See* AR 12-2734 to 35 (denoting small businesses).

The Evaluation Board conducted its evaluation of all offerors between September 29 and December 12, 2017.  AR 16-2810.  The Evaluation Board briefed the Advisory Council on December 12, 2017, AR 12-2729, and produced its final report on March 1, 2018, AR 16-2806.[8]  The Advisory Council reviewed the Evaluation Board's briefing and report, AR 15-2771, briefed the Selection Authority on December 18, 2017, AR 13-2739, and produced its final report on March 1, 2018, AR 16-2765.  The Selection Authority released the Source Selection Decision on March 2, 2018, AR 17-4483, having previously received written and oral briefings from both the Evaluation Board and Advisory Council, AR 17-4449.

All 10 offerors received acceptable ratings on the three Entry Gate Criteria and proceeded to evaluation.  *E.g.*, AR 12-2734; AR 17-4448 to 49.

*1.  Army's review of technical acceptability.*

The Evaluation Board assigned ATSC a Technical rating of Marginal, finding 23 weaknesses.  AR 16-2854.  The Evaluation Board's report documents for each Technical weakness the pertinent requirement from the solicitation followed by the rationale for assigning a weakness.  *E.g.*, AR 16-2854 (identifying a requirement from "Section C[], Paragraph 5.2.3c[]: 'Description of personnel responsibility and organization alignment,'" followed by a discussion of ATSC's weakness); *see also* AR 16b-2952 to 3737 (documenting the specific evaluation questions and each evaluator's findings for each offeror's Contractor, Risk, and Task Order Management Plans).  Of ATSC's 23 weaknesses, seven weaknesses related to the Contract Management Plan, 13 to the Sample Task Order-specific Risk Management Plan, two to the Sample Task Order-specific Task Order Management Plan, and one to the labor Crosswalk.  AR 16-2854 to 61.  The Advisory Council concurred with the weaknesses identified by the Evaluation Board and the Marginal Technical rating.  AR 15-2772 to 73.[9]

The seven Contract Management Plan weaknesses generally involved omissions of information or lack of details required by the solicitation.  *See generally* AR 16-2854 to 56.  For example, one weakness cites failing to describe the contract management roles of the different position titles listed in its organization chart.  AR 16-2854.  In another, ATSC's skill classification crosswalk only included 12 of 18 members of ATSC's proposed subcontracting

---

[8]The Evaluation Board's report skips from page 9 (AR 16-2814) to page 13 (AR 16-2815).  It is uncertain whether three pages were omitted from the record or if the page numbering is in error.

[9]The Contract Review Board indicated in briefing in March 2018 that ATSC's proposal was "inadequate" and that ATSC was "not considered technically capable to perform based on its submitted Technical Volume."  AR 14-2759.  The basis for this opinion is not readily evident, as the conclusions of the Evaluation Board and Advisory Council do not make such a statement even after finding ATSC's technical proposal to be Marginal due to weaknesses.  The Selection Authority's decision does not cite the Contract Review Board's opinion.

team.  AR 16-2855; *see also* AR 11d-2136 to 2267.[10]  And in yet another, ATSC addressed a requirement by merely repeating that requirement.  *Compare* AR 6-806 ("Contractor within the Competitive Pool without an awarded [task order] will include . . . their efforts to maintain satisfactory participation levels."), *with* AR 11b-2021 to 22 ("The [Contract Management Plan] will include a description of efforts to maintain satisfactory participation levels without an awarded [task order].").

A recurring theme existed among the 13 weaknesses ascribed to the Risk Management Plan—ATSC's proposal provided incomplete or generic details.  The Evaluation Board found that ATSC "simply provided a definition or high level explanation of the requirement" rather than relate the plan to the Sample Task Order.  AR 16-2857.  For each of the 13 weaknesses related to the Risk Management Plan, the Evaluation Board invoked a specific requirement for the plan and noted that ATSC's proposal provided only a general discussion of the requirement, untethered to the Sample Task Order.  *See* AR 16-2857 to 60.  ATSC's Risk Management Plan only briefly mentioned aircraft and never mentions Afghanistan nor any risks one would expect to encounter in a rugged, undeveloped, and hostile environment.  *See* AR 11b-2040 to 43.  One evaluator noted that the Technical proposal identified risks that "were not consistent with the [Sample Task Order] nor were the [m]itigation steps fully exampled."  AR 16b-3260.  Another commented that the risks identified "had no bearing on contract risks," nor did the proposal address performance, schedule, or cost.  AR 16b-3267; *see also* AR 16b-3276.  A third evaluator found many Risk Management Plan requirements met, but only by finding "clear intent" to meet the requirement having applied "the same creative license used in prior review."  AR 16b-3260 to 61.

ATSC's two weaknesses regarding its Task Order Management Plan both involved its failure to designate key personnel for one of the three primary sites in Afghanistan.  AR 16-2860.[11]  In the labor Crosswalk, several labor categories did not meet the education or experience level required by the solicitation's labor categories.  AR 16-2861.

The remaining nine offerors all received a Technical rating of Acceptable.  *E.g.*, AR 16-2811, and none had a comparable level of weaknesses.[12]

---

[10]ATSC explains in its Technical volume that six subcontractors are excluded because they do not provide services, AR 11b-2056, but this page was among those removed from review for exceeding the page limitations, AR 11c-2110.

[11]Aside from identifying two of the three primary work sites in Afghanistan and the two types of helicopters to be serviced, ATSC's Task Order Management Plan contains no other details of the Sample Task Order, and much of its Management Plan contains generic language.  *See* AR 11b-2043 to 49; *see also, e.g.*, AR 11b-2043 ("ATSC[] will provide a highly trained management team consisting of [three management personnel] and a significant number of aviation professionals.").  The Evaluation Board, however, did not assign ATSC a weakness for presenting a generic plan to manage the Sample Task Order.

[12]C-1 had three strengths and six weaknesses.  AR 16-2816.  Five weaknesses involved details missing from either the Contract, Risk, or Task Order Management Plans, AR 16-2816 to 19, and the sixth resulted from several of C-1's labor categories not meeting the required

The Advisory Council concurred with the Evaluation Board's ratings, AR 15-2771 to 75, and summarized the findings of the Evaluation Board for each offeror, *e.g.*, AR 15-2775 (summarizing offeror C-9 and Pinnacle). It noted, however, that it could "see an argument that [C-3's and C-9's] rating could be lower," but nonetheless concurred with an Acceptable rating. AR 15-2772, 2775. Both C-3 and C-9 had ten weaknesses, while the remainder exclusive of ATSC had between four and seven. *E.g.*, AR 15-2771 to 75. The Selection Authority also concurred with the findings and ratings of the Evaluation Board's evaluation and the Advisory Council's comparative analysis. AR 17-4449.

| Technical Evaluation Summary (initial evaluation) | | | | | | |
|---|---|---|---|---|---|---|
| *Offeror* | *Management Plans* | | | *Labor Crosswalk* | *Total* | *Rating* |
| | *Contract* | *Risk* | *Task Order* | | | |
| C-1 ([***]) | 3 (s) 2 (w) | 1 (w) | 1 (w) | 1 (w) | **3 (s)** **6 (w)** | *Acceptable* |
| C-2 ([***]) | 2 (w) | 2 (w) | 2 (w) | 1 (w) | **7 (w)** | *Acceptable* |
| C-3 ([***]) | 7 (w) | | 1 (s) 2 (w) | 1 (w) | **1 (s)** **10 (w)** | *Acceptable* |
| C-4 | | | | | | *Marginal* |

education or experience level, AR 16-2819. C-2's proposal received seven weaknesses. AR 16-2828. Six weaknesses involved details missing from either the Contract, Risk, or Task Order Management Plans, AR 16-2828 to 30, and the seventh resulted from several of C-2's labor categories not meeting the required education or experience level, AR 16-2830 to 31. C-3 had one strength and ten weaknesses. AR 16-2841. Nine weaknesses involved details missing from either the Contract or Task Order Management Plans, AR 16-2841 to 44, and the tenth resulted from several of its subcontractors' labor categories not meeting the required education or experience level, AR 16-2845. C-5's proposal had two strengths and five weaknesses. AR 16-2872. Four weaknesses involved details missing from either the Contract or Risk Management Plans, AR 16-2872 to 74, and the fifth resulted from several of its subcontractors' labor categories not meeting the required education or experience level, AR 16-2874. C-6 had one strength and four weaknesses. AR 16-2883. All weaknesses involved details missing from either the Contract, Risk, or Task Order Management Plans, AR 16-2883 to 85. C-7's proposal had five weaknesses. AR 16-2894. Four weaknesses involved details missing from either the Contract, Risk, or Task Order Management Plans, two of which resulted from the same omission, AR 16-2894 to 95, and the fifth resulted from subcontractors' labor categories not meeting the required education or experience level, AR 16-2896. C-8's proposal had four weaknesses, all involving details missing from either the Contract or Task Order Management Plans. AR 16-2906 to 07. C-9's proposal had ten weaknesses. AR 16-2915. Nine weaknesses involved details missing from either the Contract or Task Order Management Plans, AR 16-2915 to 18, and the tenth resulted from subcontractors' labor categories not meeting the required education or experience level, AR 16-2918. Pinnacle's proposal had six weaknesses. AR 16-2927. Five weaknesses involved details missing from either the Contract or Task Order Management Plans, AR 16-2927 to 29, and the sixth resulted from subcontractors' labor categories not meeting the required education or experience level, AR 16-2929.

| (ATSC) | 7 (w) | 13 (w) | 2 (w) | 1 (w) | **23 (w)** | |
| C-5 ([***]) | 2 (s) 2 (w) | 2 (w) | | 1 (w) | **2 (s) 5 (w)** | *Acceptable* |
| C-6 ([***]) | 1 (s) 1 (w) | 2 (w) | 1 (w) | | **1 (s) 4 (w)** | *Acceptable* |
| C-7 ([***]) | | 1 (w) | 2 (w) | 1 (w) | 1 (w) | **5 (w)** | *Acceptable* |
| C-8 ([***]) | | 2 (w) | 2 (w) | | | **4 (w)** | *Acceptable* |
| C-9 ([***]) | 4 (w) | | 5 (w) | 1 (w) | **10 (w)** | *Acceptable* |
| C-10 (Pinnacle) | 4 (w) | | 1 (w) | 1 (w) | **6 (w)** | *Acceptable* |
| (s) Strength; (w) Weakness.   *See* AR 16-2816 to 19 (C-1), 2828 to 31 (C-2), 2841 to 45 (C-3), 2854 to 61 (C-4), 2872 to 74 (C-5), 2883 to 85 (C-6), 2894 to 96 (C-7), 2906 to 07 (C-8), 2915 to 18 (C-9), 2927 to 29 (C-10). | | | | | | |

   *2.   Army's review of past performance.*

   The Evaluation Board assigned ATSC a Past Performance Rating of Neutral Confidence "based on [the] performance record being so sparse that no meaningful confidence assessment can be reasonably assigned." AR 16-2862.  ATSC submitted three contracts documenting its own performance.  AR 11e-2271.  The first was an approximately $10.0 million foreign military sales contract originating from the Redstone Army Contracting Command (the same contracting command for this procurement) that occurred between December 2016 and July 2018, and involved logistical services to support rotary-wing aircraft.  AR 11e-2279, 2283 to 85.  The Evaluation Board found the performance relevant, but did not obtain a Past Performance Questionnaire from the contracting agency.  AR 16-2862.  The second was an approximately $6.9 million foreign military sales contract originating from the Natick Army Contracting Command that occurred between September 2016 and May 2018, and involved logistical services to support rotary-wing aircraft.  AR 11e-2279 to 80, 2285 to 88.  The Evaluation Board found the performance relevant and obtained a Past Performance Questionnaire assigning a rating of "Good."  AR 16-2863.  The third was an approximately $6.5 million foreign military sales contract originating from the Defense Security Cooperation Agency that was ongoing at the time of submission and involved developing and installing an avionics package for fixed-wing aircraft.  AR 11e-2280 to 81, 2288 to 90.  The Evaluation Board found the performance relevant and obtained a Past Performance Questionnaire assigning ratings of "Good" to "Outstanding." AR 16-2863.  All three involved performance within the United States and overseas in Lebanon, Kenya, and Israel, respectively.  AR 11e-2279 to 81.

   ATSC submitted one contract each for two key subcontractors.  AR 11e-2271.  The first contract provided contractor logistical support for sonar enhancements to Chilean Navy helicopters.  AR 11e-2281 to 82, 2290 to 93.  The second provided logistical support for non-standard and Russian-made helicopters.  AR 11e-2281 to 82, 2293 to 96.  The Evaluation Board

rated both as relevant, but did not obtain a Past Performance Questionnaire from the contracting agency for either.  AR 16-2863 to 64.

The Evaluation Board found no Contractor Performance Assessment Reports ("CPARs") for any of the five contracts submitted by ATSC.  Regarding the first two contracts, the Evaluation Board noted that since the contracts were awarded in August and September 2016, "the CPARS report has not had enough time to be placed into the [Past Performance Information Retrieval System]."  AR 16c-3779.  The Evaluation Board noted that the third contract "should have had a [Report]," AR 16c-3779, and commented that any Past Performance Questionnaires and CPARs received before the end of the evaluation period would, however, be reviewed and incorporated into the Past Performance rating.  AR 16c-3779.

Offerors C-1, C-2, and C-5 received Substantial Confidence ratings.  *E.g.*, AR 16-2811.[13]
Offeror C-3 and Pinnacle received a Satisfactory Confidence rating.  *E.g.*, AR 16-2811.[14]
Offerors C-6, C-7, C-8, and C-9 received Neutral Confidence ratings.  *E.g.*, AR 16-2811.[15]

---

[13]C-1 submitted four contracts, all relevant.  AR 16-2820 to 21.  Past Performance Questionnaires existed for three, which gave ratings of Acceptable to Outstanding, and CPARs existed for all four, assigning ratings of Satisfactory to Exceptional.  AR 16-2820 to 21. Contract values ranged from $40 million to $160 million.  AR 16c-3742 to 45.  C-2 submitted one very relevant and two relevant contracts, all having Past Performance Questionnaires and CPARs rating performance as Satisfactory to Exceptional.  AR 16-2832 to 33.  Contract values ranged from $49 million to $77 million.  AR 16c-3751 to 53.  C-5 submitted two very relevant and one relevant contracts.  AR 16-2875 to 76.  The Army received Past Performance Questionnaires for all three, reflecting ratings of Acceptable to Outstanding, and CPARs for one, reflecting a rating of Marginal to Very Good.  AR 16-2875 to 76.  Contract values ranged from $83 million to $733 million.  AR 16c-3783 to 87.

[14]C-3 submitted five contracts rated relevant, one somewhat relevant, and one not relevant.  AR 16-2846 to 48.  Excluding the irrelevant contract, one had only a Past Performance Questionnaire, three had both Past Performance Questionnaires and CPARs, and two had neither. AR 16-2846 to 48.  Ratings ranged from Marginal to Exceptional.  AR 16-2846 to 48.  Contract values, excluding the irrelevant contract, ranged from $2 million to $106 million.  AR 16c-3759 to 65.  Pinnacle submitted three somewhat relevant and one relevant contracts.  AR 16-2930 to 32.  One had only a Past Performance Questionnaire, one only a CPAR, one had both, and the relevant contract had neither.  AR 16-2930 to 32.  Ratings ranged from Satisfactory to Exceptional.  AR 16-2930 to 32.  Contract values ranged from $27 million to $200 million.  AR 16c-3832 to 36.

[15]C-6 submitted one relevant and two somewhat relevant contracts, receiving a Past Performance Questionnaire for one somewhat relevant contract that reflected an Acceptable rating.  AR 16-2886 to 87.  Contract values ranged from $42 million to $5.1 billion.  AR 16c-3793 to 96.  C-7 submitted two relevant and two somewhat relevant contracts, receiving one Past Performance Questionnaire that contained no ratings.  AR 16-2897 to 98.  Contract values ranged from $16 million to $297 million.  AR 16c-3802 to 08.  C-8 submitted one relevant and three somewhat relevant contracts.  AR 16-2908 to 09.  One contract had only a Past Performance Questionnaire, one only a CPAR, one had both, and the one relevant contract had

| Summary of Past Performance Contracts (initial evaluation) | | | | | |
|---|---|---|---|---|---|
| *Offeror* | *Contract* | *Relevancy* | *PPQ & Rating* | *CPAR & Rating* | *Confidence* |
| C-1 ([***]) | a: | relevant | good - outstanding | satisfactory - exceptional | Substantial |
| | b: | relevant | acceptable - outstanding | satisfactory - exceptional | |
| | c: | relevant | - | very good - exceptional | |
| | d: | relevant | acceptable - outstanding | satisfactory - exceptional | |
| C-2 ([***]) | a: | very rel. | good - outstanding | satisfactory - exceptional | Substantial |
| | b: | relevant | outstanding | satisfactory - exceptional | |
| | c: | relevant | good - outstanding | satisfactory - very good | |
| C-3 ([***]) | a: | not rel. | - | - | Satisfactory |
| | b: | somewhat | - | - | |
| | c: | relevant | good – outstanding | satisfactory – exceptional | |
| | d: | relevant | outstanding | very good – exceptional | |
| | e: | relevant | good – outstanding | very good – exceptional | |
| | f: | relevant | - | - | |
| | g: | relevant | marginal – good | - | |
| C-4 (ATSC) | a: | relevant | -* | -* | Neutral |
| | b: | relevant | good | - | |
| | c: | relevant | good – outstanding | - | |
| | d: | relevant | - | - | |
| | e: | relevant | - | - | |
| C-5 ([***]) | a: | very rel. | acceptable - outstanding | n/a | Substantial |
| | b: | very rel. | very good | marginal – very good | |
| | c: | relevant | good - outstanding | n/a | |
| C-6 ([***]) | a: | relevant | - | - | Neutral |
| | b: | somewhat | acceptable | - | |
| | c: | somewhat | no rating on PPQ | - | |
| C-7 ([***]) | a: | relevant | no rating on PPQ | - | Neutral |
| | b: | relevant | - | - | |
| | c: | somewhat | - | - | |
| | d: | somewhat | - | - | |
| C-8 ([***]) | a: | somewhat | - | satisfactory – very good | Neutral |
| | b: | somewhat | outstanding | - | |
| | c: | somewhat | good | n/a – exceptional | |
| | d: | relevant | - | - | |
| C-9 ([***]) | a: | somewhat | - | - | Neutral |
| | b: | not rel. | - | - | |
| | c: | somewhat | - | - | |
| | d: | relevant | - | - | |
| C-10 | a: | somewhat | acceptable – outstanding | very good – exceptional | Satisfactory |

neither.  AR 16-2908 to 09.  Contract values ranged from $1 million to $5.1 billion.  AR 16c-3813 to 15.  C-9 submitted one not relevant contract, two somewhat relevant contracts, and one relevant contract, none of which had any evaluative reports.  AR 16-2919 to 20.  Contract values exclusive of the irrelevant contract ranged from $76 million to $98 million.  AR 16c-3824 to 26.

| (Pinnacle) | b:<br>c:<br>d: | somewhat<br>somewhat<br>relevant | good – outstanding<br>-<br>- | -<br>satisfactory – exceptional<br>- | |
|---|---|---|---|---|---|

*PPQ*: Past Performance Questionnaire; *CPAR*: Contractor Performance Assessment Report
* contract performed for Redstone Army Contracting Command.
*See* AR 16-2820 to 21 (C-1), 2832 to 33 (C-2), 2846 to 48 (C-3), 2862 to 63 (C-4), 2875 to 76 (C-5), 2886 to 87 (C-6), 2897 to 98 (C-7), 2908 to 09 (C-8), 2919 to 20 (C-9), 2930 to 31 (C-10).

The Advisory Council concurred with the Evaluation Board's ratings, AR 15-2776 to 78, and summarized the findings of the Evaluation Board for each offeror, *e.g.*, AR 15-2776 to 77 (summarizing offeror C-1). The Advisory Council did not explain its concurrence aside from stating it reviewed each offeror's submissions and the Evaluation Board's report.

The Selection Authority also concurred with the findings and ratings of the Evaluation Board's evaluation and the Advisory Council's comparative analysis, but apart from summarizing each contract, did not provide further explanation for relevancy and confidence ratings. AR 17-4449. The Selection Authority's past performance discussion also used language nearly identical to that in the Advisory Council's report, a commonality that perpetuates throughout all other sections. *Compare, e.g.*, AR 17-4454 to 55, *with* AR 15-2776 to 77.

    *3.  Army's review of price.*

The Evaluation Board calculated the total of ATSC's proposed labor rates to be $63,950, finding it "fair and reasonable," but noting, however, three issues. ATSC failed to propose ceiling rates for one labor category for year 7 and for a second category for year 8. AR 16-2865 to 66. ATSC also did not provide evidence that the government had reviewed its accounting systems. AR 16-2866. The Evaluation Board "noted no errors" in ATSC's labor rate table. AR 16-2866.

Two readily apparent typographic errors in ATSC's wage determination formulas caused the two missing labor ceiling rates. *See* AR 11g at Prime Labor Rate Table lines 1894-97, 2183-86 (calculating the proposed ceiling rate based on a formula that considers the allocation of labor between the prime and subcontractor, at Prime Labor Rate Table col. Q and underlying formula).[16] Uncovering the second error also revealed errors in the labor ceiling formulas for all

---

    [16]In Year 7 for the "Engineer, Electrical Level 3 (Senior / Lead Engineer)" labor category, the subcontract labor rate contained a value denoting an error in the calculation. The subcontract labor rate was calculated by referencing another value on another spreadsheet, though several added letters in the formula reference a non-existent location. *Compare* AR 11g at Prime Labor Rate Table col. O and underlying formulas at lines 1890-93 *and* 1898-1901, *with* lines 1894-97. A similar error exists in Year 8, with the formula for the subcontract labor rate (col. O) for the "Configuration Data Analyst" category (lines 2179-82) calling for cell F561 in another spreadsheet when it should reference cell F571. *Compare* AR 11g at Prime Labor Rate Table col. O and underlying formulas at lines 2179-82, *with* lines 2175-58. All subsequent formulas in column O for Year 8 similarly call for values 10 cells below the intended target.

labor categories in year 8 beginning with "Configuration Data Management." When all formula errors are rectified, the total of ATSC's proposed labor rates increases slightly to $64,134.

The Advisory Council concurred with the Evaluation Board's assessment. AR 15-2791. It further recommended against awarding a contract to ATSC "due to the [two labor rate] omissions." AR 15-2791. The Selection Authority concurred with the findings of the Evaluation Board and the recommendations of the Advisory Council, and accordingly found ATSC ineligible for award due to the missing labor rates and failure to evidence government approval of its accounting system. AR 17-4469.

Offerors C-1 and C-8 presented compliant, complete, and error-free Price volumes. *E.g.*, AR 17-4467 to 74. Offeror C-1's cumulative labor rate was $152,605. *E.g.*, AR 17-4467. Offeror C-8's cumulative labor rate was $111,589. *E.g.*, AR 17-4472. The other offerors had issues in their Price volumes, and accumulative rates ranged from $31,359 to $159,345.[17]

---

[17]Among the remaining seven offerors, C-2's combined labor rate was $60,996, but its proposal had two issues: a missing page that prevented validation of one labor rate and a fringe benefit rate less than allowed by labor standards. *E.g.*, AR 15-2789. C-3's labor rate was $95,285, and its proposal had two compliance issues: a missing wage determination rates table and missing ceiling rates for nine labor categories in Year 1. *E.g.*, AR 15-2789 to 90. Both issues made C-3 ineligible. AR 15-2770. C-3's proposal was also incomplete due to an inability to match the labor categories in the labor rate table to the Technical volume's skill classification spreadsheet, and C-3's accounting systems had not been evaluated by the government. *E.g.*, AR 15-2790. C-5's labor rate was $31,359, and its proposal had three compliance issues: a missing wage determination rates table (which made the proposal ineligible for award), not connecting fringe benefits to its wage determination, and not providing evidence of an audit by the Department of Defense. *E.g.*, AR 15-2791 to 92. C-5's proposal was also incomplete due to discrepancies between labor categories in the labor rate table and the Technical volume's skill classification spreadsheet. *E.g.*, AR 15-2792. C-6's labor rate was $96,039, and its proposal had two compliance issues: it completed one column of the labor rate table incorrectly and several labor categories could not be matched the offeror's wage determination rates. *E.g.*, AR 15-2793. C-6's proposal was also incomplete due to a missing contractor labor category crosswalk. *E.g.*, AR 15-2793. C-7's labor rate was $91,900, and its proposal had one completeness issue due to discrepancies between labor categories in the labor rate table and the Technical volume's skill classification spreadsheet. *E.g.*, AR 15-2793 to 94. C-9's labor rate was $159,345, and its proposal had two compliance issues: missing wage determinations (which made the proposal ineligible for award) and failure to map labor rates for Years 2 through 10. *E.g.*, AR 15-2794 to 95. C-9's proposal was also incomplete due to discrepancies between labor categories in the labor rate table and the Technical volume's skill classification spreadsheet. *E.g.*, AR 15-2794 to 95. Pinnacle's labor rate was $106,392, and its proposals had several issues that included not providing evidence of an audit by the Department of Defense, not connecting fringe benefits to its wage determination, missing information for two labor categories, and citing incorrectly government-determined wage rates for three categories. *E.g.*, AR 15-2796; AR 16-2933 to 35.

The Evaluation Board found "adequate price competition for comparison of offers to validate" whether prices were fair and reasonable. *E.g.*, AR 16-2822, AR 16d.11-3915. All prices were considered fair and reasonable, *e.g.*, AR 17-4467 to 74; AR 16d.11-3915, notwithstanding the documented errors and compliance and completeness issues.

The Advisory Council concurred with all Evaluation Board findings, and based on issues with the Price volume, recommended against award for offerors C-3, ATSC, C-5 and C-9. AR 15-2790 to 93, 2795. The Selection Authority concurred with the findings of the Evaluation Board and the recommendations of the Advisory Council. AR 17-4467 to 75.

| Summary of Price Evaluation (initial evaluation) | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Offeror* | *Price* | *Fair & Reasonable* | *Compliant* | *Complete* | *Error-Free* | *Accounting System* | *Eligible for Award* |
| C-1 ([***]) | $152,605 | Yes | Yes | Yes | Yes | Approved | Eligible |
| C-2 ([***]) | $60,996 | Yes | No | Yes | Yes | Approved | Eligible |
| C-3 ([***]) | $95,285 | Yes | No | No | Yes | Not Verified | Ineligible |
| C-4 (ATSC) | $63,950 | Yes | No | Yes | Yes | Not Verified | Ineligible |
| C-5 ([***]) | $31,359 | Yes | No | No | Yes | Approved | Ineligible |
| C-6 ([***]) | $96,039 | Yes | No | No | Yes | Approved | Eligible |
| C-7 ([***]) | $91,900 | Yes | Yes | No | Yes | Approved | Eligible |
| C-8 ([***]) | $111,589 | Yes | Yes | Yes | Yes | Approved | Eligible |
| C-9 ([***]) | $159,345 | Yes | No | No | Yes | N/A* | Ineligible |
| C-10 (Pinnacle) | $106,392 | Yes | No | Yes | Yes | Approved | Eligible |

*C-9 did not intend to submit proposals for cost-type task orders, to which this requirement applied.
*See, e.g.*, AR 16-2822 to 23 (C-1), 2834 to 35 (C-2), 2849 to 50 (C-3), 2865 to 67 (C-4), 2877 to 79 (C-5), 2888 to 90 (C-6), 2900 to 01 (C-7), 2910 to 11 (C-8), 2921 to 22 (C-9), 2933 to 35 (C-10).

### 4. *Army's review of Small Business Participation.*

ATSC's Small Business volume described 17 subcontractors who are part of the "ATSC Aviation Team," 14 of which ATSC was "fully committed to using . . . for the duration of the

contract." AR 11i-2678 to 82; 2686 to 87. All were small businesses and many met other government socioeconomic classifications. AR 11i-2686 to 87. Specific to the Sample Task Order, ATSC proposed a price of $79 million, to be divided among itself and three subcontractors, all of whom, like ATSC, were small businesses. AR 11i-2677, 82. ATSC would perform 69% of the work. AR 11i-2682. ATSC also pledged to use small businesses for at least 95% of all work awarded to it under the contract. AR 11i-2703. ATSC provided its teaming agreements with the 17 subcontractors, but included only the first page of each of these agreements that ran 11 to 15 pages. AR 11i-2712 to 28.[18]

The Evaluation Board rated ATSC as Marginal under the Small Business Factor. AR 16-2868. ATSC received one significant strength for committing to use small businesses for 100% of work based on the Sample Task Order, with ATSC performing 69% of the work by value. AR 16-2870. ATSC received a significant weakness for not identifying, as required by the solicitation, the "variety and complexity of the work" small firms were to perform. AR 16-2869. ATSC's teaming agreements were deemed inadequate "to determine [the] amount of variety and complexity" of work assigned to small business, preventing the evaluators from determining "if small businesses are being utilized for skilled work or being relegated to menial tasks." AR 16-2869. The Evaluation Board also identified five uncertainties: ATSC listed one subcontractor under an industry classification code that did not appear to correlate with the Sample Task Order, listed a second subcontractor under a non-existent code, designated two subcontractors as meeting four and two socioeconomic classifications, respectively, when these met seven and three, respectively, provided prices and small business participation rates for the option years in total instead of by each year, and proposed 0% participation goals for three socioeconomic categories when two of its subcontractors would actually provide participation under these categories. AR 16-2868 to 70.

The Advisory Council and the Selection Authority summarized the findings of the Evaluation Board and concurred with the Marginal rating for ATSC without further comment. AR 15-2799; AR 17-4477 to 78. Four other offerors, C-1, C-2, C-6, and C-7 also received Marginal ratings for small business participation.[19]

---

[18]In the narrative portion of the Small Business Volume, ATSC states that it provided "[f]ully executed teaming agreements . . . ." AR 11i-2685.

[19]C-1 proposed a participation rate of either 44.2% or 46.2%, and had one significant strength (providing teaming agreements), one weakness, one significant weakness (teaming agreements were identical, obscuring the complexity of work covered), and one uncertainty. *E.g.*, AR 15-2797. C-2 proposed a 35% small business participation rate. AR 16e-3925. C-2's proposal had one significant strength (providing teaming agreements), three weaknesses (*e.g.*, omitting the value of small business participation), two significant weaknesses (failure to identify many of its subcontracting team and small business usage averaging 20% on contracts within the last three years), and one uncertainty (using prohibited industry codes for subcontractors procuring parts). *E.g.*, AR 15-2797 to 98. C-6 received one significant strength (providing teaming agreements) and three weaknesses (two involved management of subcontractors and the third involved insufficient information to determine past rates of small business usage). *E.g.*, AR 15-2800. C-7's proposal had one significant strength (providing teaming agreements), three weaknesses (omitting dollar values assigned to each socioeconomic

In contrast, offerors C-3, C-5, C-8, and Pinnacle received Acceptable ratings.[20]  The Evaluation Board rated C-9 as Marginal, but the Advisory Council and Selection Authority listed an Acceptable rating.[21]  *Compare, e.g.*, AR 16-2811, AR 17-2770, *and* AR 18-4499, *with, e.g.*, AR 15-2803, AR 17-4481, *and* AR 20-4606.  There is no acknowledgment of the different ratings.  No intent to adjust the initial Marginal rating is evident, and the Acceptable rating apparently represents a clerical error.[22]

The Advisory Council and the Selection Authority summarized the findings of the Evaluation Board and concurred with all ratings without further comment.  AR 15-2797 to 2804; AR 17-4475 to 82.

| Summary of Small Business Participation (initial evaluation) | | | | | | |
|---|---|---|---|---|---|---|
| *Offeror* | *Offeror Pool* | *Small Business Participation* | *Strengths* | *Weaknesses* | *Uncertainties* | *Rating* |
| C-1 ([***]) | Unrestricted | 46.2% | 1 (sig s) | 1 (sig w) 1 (w) | 1 | Marginal |

---

category, subcontractor oversight omissions, and not discussing its process to pay subcontractors), one significant weaknesses (teaming agreements were identical, obscuring the complexity of work covered), and one uncertainty (using a subcontractor whose industry code that did not appear to correlate to the Sample Task Order).  *E.g.*, AR 15-2800 to 01.

[20]C-3 would self-perform 46.2% of the work and its proposal had one significant strength (providing teaming agreements), one strength (80% small business participation rate and 54% rate of subcontracting), and one uncertainty (using prohibited industry codes for subcontractors procuring parts).  *E.g.*, AR 15-2798; AR 16-2852.  C-5 proposed a 58% small business participation rate and had one significant strength (providing teaming agreements) and one uncertainty (representing non-small business participation as 0.4%, leaving uncertainty about the remaining of 41.6%).  *E.g.*, AR 15-2800.  C-8 had one strength: it proposed a small business participation rate of 68% and would self-perform 55% of the work.  *E.g.*, AR 15-2801.  Pinnacle received one significant strength (providing teaming agreements), one strength (small business participation rate of 76% while self-performing 60%), one weakness (failure to assure subcontractors would be paid within 15 days of invoice receipt), and two uncertainties (listing erroneously one subcontractor as belonging to four socioeconomic classifications instead of three and adding incorrectly the utilization rate of small and large businesses).  *E.g.*, AR 15-2803.

[21]C-9 proposed 55% for small business participation, AR 16e-3949, and received five weaknesses (providing incorrect information about two subcontractors, a lack of details on managing subcontractors, omitting the dollar value for small business participation, not affirming subcontractors would be paid within 15 days of receipt of an invoice), and three uncertainties (*e.g.*, misidentifying the socioeconomic classification of two subcontractors).  *E.g.*, AR 15-2801 to 03.

[22]The discrepancy is immaterial, as C-9 was included in the competitive range, but later excluded from award for unrelated reasons.

| C-2 ([***]) | Unrestricted | 35% | 1 (sig s) | 2 (sig w) 3 (w) | 1 | Marginal |
|---|---|---|---|---|---|---|
| C-3 ([***]) | Restricted (Small) | 80% (46% self) | 1 (sig s) 1 (s) | 0 | 1 | Acceptable |
| C-4 (ATSC) | Restricted (Small) | 100% (69% self) | 1 (sig s) | 1 (sig w) | 5 | Marginal |
| C-5 ([***]) | Unrestricted | 58% | 1 (sig s) | 0 | 1 | Acceptable |
| C-6 ([***]) | Unrestricted | unreported | 1 (sig s) | 3 (w) | 0 | Marginal |
| C-7 ([***]) | Unrestricted | unreported | 1 (sig s) | 1 (sig w) 3 (w) | 1 | Marginal |
| C-8 ([***]) | Restricted (Small) | 68% (55% self) | 1 (s) | 0 | 0 | Acceptable |
| C-9 ([***]) | Unrestricted | 55% | 0 | 5 (w) | 3 | Marginal* |
| C-10 (Pinnacle) | Restricted (Small) | 76% (60% self) | 1 (sig s) 1 (s) | 1 (w) | 2 | Acceptable |

(sig s) Significant Strength ; (s) Strength ; (w) Weakness ; (sig w) Significant Weakness.
*See, e.g.*, AR 15-2797 to 2804; AR 16-2868 to 70; AR 16e-3925.
\* All Evaluation Board materials reference a Marginal rating, which would be consistent with the evaluation. The Advisory Council and Selection Authority reportedly concurred with the Evaluation Board, but listed an Acceptable rating. *Compare, e.g.*, AR 16-2811, AR 17-2770, *and* AR-4499, *with, e.g.*, AR 15-2803, AR 17-4481, *and* AR 20-4606.

### 5.   Selection Authority's best value determination and initial award decisions.

The Evaluation Board, though not conducting a best value analysis, identified Offerors C-3, ATSC, C-5, and C-9 as ineligible for award due to issues with their Price volumes.  AR 16-2811 to 13.  C-3, C-5, and C-9 failed to provide required wage determinations.  AR 16-2811 to 12.  C-3 and ATSC failed to propose ceiling rates for all labor categories.  AR 16-2811 to 12.  Other issues existed with these and other offerors that would not preclude award.  AR 16-2811 to 12.  The Advisory Council concurred with the ineligibility determinations of the Evaluation Board and additionally noted that offeror C-5 did not provide an electronic copy of Volume V (Contract Documentation), which would also make C-5 ineligible for award.  AR 15-2803 to 04.

The Advisory Council recommended that "if the [Selection Authority] chooses to award without discussions," award should be made to C-1, C-2, C-6, C-7, C-8, and Pinnacle.  AR 15-2805.  The Advisory Council recommended against award for C-3, ATSC, C-5, and C-9 for failure to comply with solicitation requirements.  AR 15-2805.  The Advisory Council also recommended against award for ATSC for "being the lowest-rated offeror."  AR 15-2805.

The Selection Authority found C-1, C-2, C-6, C-7, C-8, and Pinnacle to be "eligible for award," "offer the best value," and "possess the technical skills needed to perform."  AR 17-

4483.  The Selection Authority concurred and found C-3, ATSC, C-5, and C-9 ineligible for award due to failure to comply with Price volume requirements.  AR 17-4483.  The Selection Authority also found that award to ATSC "would not be in the best interest of the [g]overnment" "based upon the finding of the Technical Team and the [Small Business Participation Team]." AR 17-4483.  The Selection Authority decided to award contracts without discussions and accordingly did not establish a competitive range.  AR 18-4539.

The Army notified offerors of the award decision on April 4, 2018.  AR 19b-4599. Unsuccessful offerors were notified by letter of the six awardees and provided with a comparison between their evaluation ratings and those of the awardees.  AR 20-4604 to 06.  All 10 offerors received debriefings, which included a description of evaluation factors, the offeror's rating compared to awardees, and a description of all findings that informed the offeror's rating.  AR 24-4616 to 54.

### D.  *Offerors C-3's and C-5's Post-Initial Award Protest & the Army's Corrective Action*

Offeror C-3 filed a protest with the Government Accountability Office ("GAO") on April 16, 2018.  AR 34-4935.  C-3 argued that "a clerical or minor error which did not preclude the [Army] from evaluating their proposed price [should not] render the proposal 'unawardable.'" AR 34-4943.  Nine of its labor ceiling rates for one year appeared as "#REF!," indicating an error in the spreadsheet's formula, and its proposal contained rates for these labor categories. AR 34-4944 to 45.  Further, its Price volume contained the rates missing from its labor table attachment.  AR 38-7290 to 93.  Second, C-3 argued that the solicitation did not require attaching applicable wage determinations, AR 34-4943, and therefore C-3's proposal complied because it contained a hyperlink to the Department of Labor's wage determination website and "stated that [C-3] 'performed an analysis of all labor categories required . . . and identified all [Service Contract Act] labor categories using the Department of Labor's website'" and then used these rates to develop its labor rate.  AR 34-4945.  C-3 noted it received a better overall evaluation at a lower price than the other two small business pool awardees (*i.e.*, Pinnacle and C-8).  AR 34-4945 to 46.  Additionally, C-3 argued that the Army erred by not conducting discussions, as Department of Defense acquisition regulations suggest discussions for contracts valued over $100 million.  AR 34-4952 to 53.  On May 25, 2018, C-3 submitted a supplemental protest, arguing that awards to other offerors who had missing information from their wage determinations amounted to unfair treatment.  AR 38-7307 to 09.

Four days later, on April 20, 2018, offeror C-5 protested the award decision to GAO.  AR 35-6472.  C-5 argued that the Army's determination of ineligibility due to the missing wage determination was unreasonable because the omission was a "minor clerical error" that it should have been allowed to fix and that the wage determination was also immaterial to the evaluation. AR 35-6487 to 88.  Further, the Army should have conducted discussions as recommended by Department of Defense acquisition regulations for contracts valued over $100 million.  AR 35-6488.  On May 31, 2018, C-5 submitted a supplemental protest, arguing that awards to other offerors who had missing information from their wage determinations amounted to unfair treatment.  *E.g.*, AR 40-7324 to 25.

On June 7, 2018, the Army notified GAO that it would take corrective action that would moot C-3's and C-5's protest.  AR 46-7395.  Accordingly, GAO dismissed both protests on June

12, 2018.  AR 47- 7396; AR 48-7397.  The Army advised that it would establish a competitive range in accord with FAR § 15.306(c), conduct discussions with those in the competitive range, request revised proposals, and make a new award decision after evaluating the revised proposals.  AR 49-7398.  The Army's action was "[b]ased upon a recommendation from the [Army Material Command] Command Counsel's Office."  AR 49-7398.  Neither ATSC nor C-9, the other two offerors who had not received awards, had filed a protest by the time the Army decided to take corrective action.

The Selection Authority approved a competitive range determination on June 21, 2018.  AR 50-7399, 7434.  The Army relied on its previous evaluations to determine "which were the most highly rated and eligible for inclusion in the competitive range."  AR 50-7400.  The Selection Authority noted that "all offerors except for [ATSC] received an 'Acceptable' rating in the Technical Factor, one of the two more heavily weighted factors," AR 50-7433 to 34.  The Selection Authority noted that ATSC had received a Marginal Technical rating, explaining how its Technical volume "contained significantly more weaknesses than any other offeror, and when examined in detail . . . did not demonstrate an adequate approach and understanding of the requirements."  AR 50-7433.  "In the other highly weighted factor, Past Performance, [ATSC] received a Neutral Confidence rating, which ranked it in the bottom half of offerors evaluated under this factor."  AR 50-7434.  When accounting for ATSC's ceiling price being "among the lowe[st]," its Marginal Small Business Participation rating, "and the underlying rationale for those ratings," the Selection Authority determined that ATSC "is not among the most highly rated offerors."  AR 50-7434.  ATSC was accordingly excluded from the competitive range while the remaining nine offerors were included.  AR 50-7434.

The Army notified ATSC of its exclusion on June 26, 2018.  AR 51-7435.  Describing its evaluation results for ATSC's proposal, the Army's notification letter explained that ATSC was not among the most highly rated "based primarily on receiving a rating of Marginal in the technical area . . . and neutral confidence in past performance, which were the two most important factors."  AR 51-7435.  The Army debriefed ATSC in writing on June 28, 2018.  AR 57-7437.  The debriefing also stated ATSC's exclusion was "[b]ased primarily on *Marginal* in Technical and *Neutral Confidence* in Past Performance, the two most important factors."  AR 52-7470 (emphasis in original).

### E.  *ATSC's Protest of the Army's Competitive Range Determination*

On July 9, 2018, ATSC filed a protest with the GAO over its exclusion from the competitive range.  AR 54-7492.  ATSC alleged that error occurred when the Army: (1) rated ATSC's proposal as Marginal under both the Technical factor, AR 54-7495 to 96, and Small Business Participation factor, AR 54-7498; (2) assigned ATSC a Neutral Confidence performance rating under the Past Performance factor and then used the neutral confidence rating as a ground for exclusion contrary to the solicitation's evaluation scheme, AR 54-7497 to 98; and, (3) excluded ATSC from the competitive range without properly considering its significantly lower price relative to other offerors, AR 54-7498 to 99.  The Army moved for dismissal of all claims as untimely, arguing that ATSC should have filed within 10 days of April 10, 2018, when ATSC received a debriefing concerning its non-selection for award.  AR 55-7508 to 09.

On August 14, 2018, GAO dismissed as untimely ATSC's claims challenging the Technical, Past Performance, and Small Business ratings, but required the Army to address ATSC's claim about improper exclusion from the competitive range given its low price.  AR 56-7511.  The Army filed its response on August 16, 2018.  AR 57-7512, 7521.  ATSC voluntarily withdrew its remaining protest on August 27, 2018, AR 59-7524, and GAO closed the protest without further action, AR 82-18332.

## F.  *Final Contract Award and Summary Table*

Discussions with the nine offerors within the competitive range commenced on June 27, 2018.  AR 63-7984.[23]  Final proposals were due by August 20, 2018.  AR 10-1861.  All remaining offerors except C-9 submitted timely revised proposals.  *E.g.*, AR 63-7984.[24]  Having removed C-9 from consideration in August for failure to timely submit a revised proposal, the Army reevaluated the remaining eight proposals.  The Evaluation Board produced its final evaluation on September 20, 2018.  AR 63-7978, 7982 to 84.[25]

---

[23]Subsequent to the Army's corrective action in June 2018, the Army amended the solicitation a fourth time, on August 4, 2018 (Amendment 0004).  *See* AR 10-1861.  Amendment 0004 closed discussions and called for submission of final proposals by August 20, 2018.  AR 10-1861 to 62.  Amendment 0004 also changed compliance requirements for the Price volume and evaluation factors for award.  AR 10-1868, 1917.

[24] Several days later, on August 23, 2018, the Army notified C-9 that its proposal "ha[d] been excluded from competition" because C-9 failed to submit a timely revised proposal.  AR 58-7522.  Revisions were due at 3:00 p.m. on August 20, 2018.  AR 10-1861 (Amendment 0004).  C-9 did not upload its proposal until 3:39 p.m.  AR 58-7522.  C-9 protested its exclusion before the contracting officer on August 31, 2018.  AR 61-7540.  The contracting officer subsequently denied the protest on September 6, 2018, AR 62-7966, and C-9 did not challenge that result.

[25]C-1's Technical rating improved to Good by adding a fourth strength and resolving five of the six weaknesses.  AR 63e-9793 to 97.  Its Past Performance rating remained unchanged at Substantial Confidence, with the only change being a slightly higher evaluation reflected on one Contract Performance Assessment report.  *Compare* AR 16c-3740 to 41, *with* AR 63f-9836 to 37.  Its evaluated price reduced slightly to $152,475 and its Price volume had no issues.  AR 63g-9934 to 35.  Its Small Business Participation rating improved to Good from Marginal, gaining one strength (proposing 45.4% of total value to small business) and resolving all weaknesses and uncertainties.  AR 63h-9970 to 72.

C-2's Technical rating remained unchanged at Acceptable, having resolved all seven weaknesses but still without any strengths.  AR 63e-9799 to 9802.  Its Past Performance rating remained unchanged at Substantial Confidence.  *Compare* AR 16c-3749 to 50, *with* AR 63f-9846 to 47.  Its evaluated price increased nearly 10% to $66,925 and its Price volume had no issues.  AR 63g-9937 to 39.  Its Small Business Participation rating improved to Acceptable from Marginal.  AR 63h-9973 to 76.

The Advisory Council concurred with all Evaluation Board assessments of revised proposals and found "all [remaining] Offerors are eligible for award." AR 64-10020. In a report

---

C-3 maintained its Acceptable Technical rating, adding a second strength and resolving eight of the 10 weaknesses. AR 63e-9804 to 09. Its Past Performance rating remained unchanged at Satisfactory Confidence. *Compare* AR 16c-3756 to 58, *with* AR 63f-9854 to 56. C-3's evaluated price decreased marginally to $95,062 and its Price volume had no issues. AR 63g-9941 to 44. Its Small Business Participation rating improved to Good by resolving the one uncertainty. AR 63h-9977 to 79.

C-5's Technical proposal remained Acceptable, having maintained both strengths and resolving four of five weaknesses. AR 63e-9811 to 14. Its Past Performance rating remained unchanged at Substantial Confidence. *Compare* AR 16c-3781 to 82, *with* AR 63f-9869 to 70. The evaluated price tripled to $104,433 and its Price volume had no issues. AR 63g-9946 to 49. Its Small Business Participation rating improved to Good by resolving the one uncertainty and adding one strength (42% small business participation rate, though down from 58% as originally proposed). AR 63h-9980 to 82.

C-6's Technical rating remained unchanged at Acceptable, maintaining its one strength and resolving all weaknesses. AR 63e-9816 to 18. Its Past Performance rating improved from Neutral to Satisfactory Confidence. *Compare* AR 16c-3791 to 92, *with* AR 63f-9880 to 81. The Army receiving a Past Performance Questionnaire and a CPAR for the one previously unevaluated relevant contract. *Compare* AR 16c-3791, *with* AR 63f-9880. C-6 also submitted another contract evaluated as somewhat relevant and which had both a favorable Past Performance Questionnaire and favorable CPAR. AR 63f-9881. C-6's evaluated price decreased nearly 10% to $87,342 and its Price volume had no issues. AR 63g-9951 to 54. Its Small Business Participation rating improved to Good from Marginal by resolving all three weaknesses and adding one strength (for subcontractor management). AR 63h-9983 to 85.

C-7 maintained its Acceptable Technical rating, resolving four of five weaknesses. AR 63e-9820 to 23. Its Past Performance rating remained unchanged at Neutral Confidence, though the Army located a favorable CPAR for one of the somewhat relevant contracts. *Compare* AR 16c-3799 to 3801, *with* AR 63f-9893 to 94. Its evaluated price increased slightly to $93,047 and its Price volume had no issues. AR 63g-9956 to 58. Its Small Business Participation rating improved to Acceptable from Marginal by resolving all weaknesses. AR 63h-9986 to 88.

C-8's Technical rating remained Acceptable, having resolved all weaknesses. AR 63e-9825 to 27. Its Past Performance rating remained unchanged at Neutral Confidence. *Compare* AR 16c-3810 to 11, *with* AR 63f-9905 to 06. Its Price volume and Small Business Participation volume remained unchanged. AR 63g-9960 to 62; AR 63h-9989 to 91.

Pinnacle's (C-10) Technical proposal remained Acceptable, resolving four of six weaknesses. AR 63e-9829 to 32. Its Past Performance rating remained unchanged at Satisfactory Confidence. *Compare* AR 16c-3829 to 30, *with* AR 63f-9916 to 17. Its evaluated price decreased slightly to $106,387 and its Price volume had no issues. AR 63g-9964 to 67. Its Small Business Participation rating remained Acceptable. AR 63h-9992 to 94.

24

essentially mirroring that of the Advisory Council, the Selection Authority also concurred, finding that all eight remaining offerors would provide best value and accordingly selecting C-1, C-2, C-3, C-5, C-6, C-7, C-8, and Pinnacle for award. AR 65-10046.

 The Army notified all eight remaining offerors of their selection for award on October 11, 2018. *E.g.*, AR 67a-18082. ATSC submitted its pre-filing notice to the court on October 12, 2018, and filed its protest on October 16, 2018.

| Summary of Evaluation Decisions and Offeror Progression | | | | |
|---|---|---|---|---|
| *Offeror* | *Initial Evaluation (all met Entry Gate Criteria)* | *Initial Award* | *Competitive Range (post correction)* | *Final Award* |
| C-1 ([***]) | Tech: Acceptable<br>PP: Substantial Confidence<br>SBP: Marginal<br>Price: $152,605 | Yes | Tech: *Good*<br>PP: Substantial Confidence<br>SBP: *Good*<br>Price: $152,475 | Yes |
| C-2 ([***]) | Tech: Acceptable<br>PP: Substantial Confidence<br>SBP: Marginal<br>Price: $60,996 | Yes | Tech: Acceptable<br>PP: Substantial Confidence<br>SBP: *Acceptable*<br>Price: *$66,925* | Yes |
| C-3 ([***]) | Tech: Acceptable<br>PP: Satisfactory Confidence<br>SBP: Acceptable<br>Price: $95,285 | No | Tech: Acceptable<br>PP: Satisfactory Confidence<br>SBP: *Good*<br>Price: $95,062 | Yes |
| C-4 (ATSC) | Tech: Marginal<br>PP: Neutral Confidence<br>SBP: Marginal<br>Price: $63,950 | No | N/A: Excluded from competitive range | No |
| C-5 ([***]) | Tech: Acceptable<br>PP: Substantial Confidence<br>SBP: Acceptable<br>Price: $31,359 | No | Tech: Acceptable<br>PP: Substantial Confidence<br>SBP: *Good*<br>Price: *$104,433* | Yes |
| C-6 ([***]) | Tech: Acceptable<br>PP: Neutral Confidence<br>SBP: Marginal<br>Price: $96,039 | Yes | Tech: Acceptable<br>PP: *Satisfactory* Confidence<br>SBP: *Good*<br>Price: *$87,342* | Yes |
| C-7 ([***]) | Tech: Acceptable<br>PP: Neutral Confidence<br>SBP: Marginal<br>Price: $91,900 | Yes | Tech: Acceptable<br>PP: Neutral Confidence<br>SBP: *Acceptable*<br>Price: $93,047 | Yes |
| C-8 ([***]) | Tech: Acceptable<br>PP: Neutral Confidence<br>SBP: Acceptable<br>Price: $111,589 | Yes | Tech: Acceptable<br>PP: Neutral Confidence<br>SBP: Acceptable<br>Price: $111,589 | Yes |
| C-9 ([***]) | Tech: Acceptable<br>PP: Neutral Confidence<br>SBP: Marginal | No | N/A: Within competitive range, but did not submit final offer for evaluation | No |

| | Price: $159,345 | | | |
|---|---|---|---|---|
| C-10 (Pinnacle) | Tech: Acceptable PP: Satisfactory Confidence SBP: Acceptable Price: $106,392 | Yes | Tech: Acceptable PP: Satisfactory Confidence SBP: Acceptable Price: $106,387 | Yes |
| Tech: Technical        PP: Past Performance | | SBP: Small Business Participation | | |

# JURISDICTION & STANDING

## A. *Standing*

This court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491. The Tucker Act vests this court with jurisdiction to "to render judgment on an action by an interested party objecting to a . . . proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

A threshold issue is whether ATSC has standing to challenge its exclusion from the competitive range, a burden borne by ATSC. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). To demonstrate standing under 28 U.S.C. § 1491(b)(1), a plaintiff must show that it is an "interested party" who suffered prejudice from a significant procurement error. *CliniComp Int'l, Inc. v. United States*, 904 F.3d, 1353, 1358 (Fed. Cir. 2018). An interested party is an actual bidder who had a substantial chance at award of the contract. *Id.*; *see also Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014) (quoting *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013)). An interested party suffers prejudice from a significant procurement error when "*but for the error*, it would have had a substantial chance of securing the contract." *CliniComp*, 904 F.3d at 1358 (emphasis in original).

ATSC's allegations and the administrative record indicate that ATSC is an interested party who has sufficiently alleged prejudice. ATSC submitted a timely proposal. The errors ATSC alleges, if valid and accepted, would likely place it within the competitive range. ATSC challenges its marginal Technical rating, a key consideration in the Army's decision to exclude ATSC from the competitive range, *see, e.g.*, AR 50-7433 to 34, and its Past Performance rating, treated by the Army as of equal importance to the Technical rating, *see, e.g.*, AR 50-7433 to 34. ATSC alleges that notwithstanding these alleged errors, its low price makes it deserving of inclusion in the competitive range. And, all eight offerors in the competitive range who submitted timely revised proposals received a contract award, even including an offeror (C-8) which had Acceptable Technical and Small Business Participation ratings, a Neutral Confidence Past Performance rating, and a price nearly double ATSC's. *See, e.g.*, AR 65-10025 to 26, 10046. Considering the spread of final ratings among the awardees, but for the alleged errors, ATSC plausibly could have been an awardee and therefore has standing.

## B. *Timeliness of ATSC's Protest (Waiver and Laches)*

The government argues that ATSC waived its right to protest by failing to challenge the alleged procurement errors pre-award, contending that ATSC had all knowledge relevant to its exclusion before the award.  The government asserts that *COMINT Systems Corp. v. United States*, 700 F.3d 1377 (Fed. Cir. 2012), expanded the judicially-created waiver rule articulated in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), "to all [bid protest] situations where the protesting party has the opportunity to raise its claim before the award of the contract."  Def.'s Cross-Mot. at 15 (quoting *COMINT*, 700 F.3d at 1382) (in turn citing *Blue & Gold*, 492 F.3d at 1315)).

In a divergent but similar vein, Pinnacle asserts the equitable defense of laches to bar ATSC's protest, arguing that ATSC "slept on its rights" to the prejudice of Pinnacle and the government by waiting three months to protest before GAO and another seven weeks after withdrawing the GAO protest before filing in this court.  Def.-Intervenor's Cross-Mot. at 8-11.

ATSC responds that waiver and laches are inapplicable.  Regarding waiver, ATSC notes that it does not operate "where bringing the challenge prior to the award is not practicable."  Pl.'s Reply at 4 (quoting *COMINT*, 700 F.3d at 1382).  ATSC contends that it "could not file[] before awards because the awards themselves provided ATSC with a critical piece of information it did not have before – that the [Army] did not actually care about offerors' non-price ratings in its evaluations."  Pl.'s Reply at 3.  ATSC argues that it gained that knowledge from the Army's awarding the contract to all offerors who submitted timely revised proposals.  ATSC further points out that not caring about non-price ratings should have caused price to be a primary discriminator, and ATSC had a price significantly below most of the awardees.  Pl.'s Reply at 5-6.  Additionally, ATSC contends that the waiver rule applies only to challenges to the solicitation, *id.*, or to a "ground rule of the solicitation," Hr'g Tr. at 6:8-18 (Jan. 3, 2019).[26]  ATSC disputes not the solicitation, but the Army's competitive range determination, which represented a "deviation from the solicitation's ground rules" that did not become apparent until after the Army's award decision.  Pl.'s Reply at 5.

Responding to Pinnacle's laches claim, ATSC asserts that laches "should apply only in 'extraordinary circumstances'" and requires a showing of "unreasonable and inexcusably delay . . . [that] caused either economic prejudice or injury to the party's ability to mount a defense."  Pl.'s Reply at 3-4 n.2 (quoting *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 568-69 (2004)).  ATSC also notes that many of the cases cited by Pinnacle that apply laches involved delays of years or more and that Pinnacle makes no mention of prejudice inflicted on its ability to defend.  *Id.* at 4 n.2.

The Tucker Act itself does not specify a statute of limitations for bid protests, but directs this court to "give due regard to . . . the need for expeditious resolution" of bid protests.  28 U.S.C. § 1491(b)(3).[27]  The Court of Appeals for the Federal Circuit has interpreted the Tucker Act's "expeditious resolution" provision to preclude challenges to a patent error in a solicitation

---

[26]Subsequent references to the transcript of the hearing held on January 3, 2019, will omit the date.

[27]As a general matter, Congress has limited this court's exercise of jurisdiction to claims brought within six years of accrual.  *See* 28 U.S.C. § 2501.

subsequent to the close of the bidding process where the party had the opportunity to protest during the bidding process. *Blue & Gold*, 492 F.3d at 1313, 1315. A protestor who fails to raise patent errors in the solicitation waives a challenge to the error once bidding closes. The Federal Circuit extended this waiver rule to post-award challenges of a solicitation when the error arose in the interval between the close of bidding and the award of the contract. *COMINT*, 700 F.3d at 1382. The waiver rule operates only when the protestor "had the opportunity to challenge a solicitation before award and failed to do so . . . ." *Id.* at 1382. "[W]here bringing the challenge prior to the award is not practicable, it may be brought thereafter." *Id.*

"Laches is 'a defense developed by courts of equity' to protect defendants against 'unreasonable, prejudicial delay in commencing suit.'" *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prod., LLC*, ___ U.S. ___, ___, 137 S. Ct. 954, 960 (2017) (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014)). "Laches is a gap-filling doctrine, [but] where there is a statute of limitations, there is no gap to fill." *Id.*, ___ U.S. at ___, 137 S. Ct. at 961. "[A]pplying laches within a limitations period specified by Congress would give judges a 'legislation-overriding' role that is beyond the Judiciary's power; . . . 'courts are not at liberty to jettison Congress' judgment on the timeliness of suit.'" *Id.*, ___ U.S. at ___, 137 S. Ct. at 960 (quoting *Petrella*, 572 U.S. at 667). The Supreme Court's reasoning in *SCA Hygiene Products* extends beyond the confines of patent law involved in that case. *See id.*, ___ U.S. at ___, 137 S. Ct. at 960-61 (discussing the doctrine of laches in general without limitation as to subject matter).

ATSC stated its challenge to the Army's competitive range determination in terms that pertain to the Army's awarding a contract to everyone in the competitive range. Pl.'s Reply at 3, 5 (The Army "did not actually care about offerors' non-price ratings."); *see also* Pl.'s Mot. at 19 ("The [Army's] conduct, thus, belies any significant that it placed on any initial or final ratings under the Technical factor for purposes of establishing the competitive range."). ATSC also notes that the Army's award decision did not discriminate between final ratings given to those within the competitive range, *see* Pl.'s Reply at 6, all of whom submitted final proposals and received awards despite disparities in ratings, *see, e.g.*, AR 65-10045 to 46. As ATSC would have it, this alleged evaluative error was not evident before the final award. The government apparently accepts this argument for some purposes. *See* Def.'s Reply at 7 ("[E]ven if the court were to find that the October 2018 awards excuse the timing of ATSC's protest, the awards would only excuse the timing of ATSC's new claim that the non-price factor ratings were pretextual as supposedly evidenced by the awards.").

As a logical matter, reexamining the competitive range on this ground would implicate the factors used to delineate the range, and thus the underlying rationale for ratings assigned to those factors, notwithstanding the fact that ATSC knew of the basis for its ratings in April 2018 and learned nothing about the ratings decisions from the October 2018 award decision. Accordingly, on this basis, the waiver rule does not apply to ATSC's protest.[28]

---

[28]The waiver rule does not specify that the protest must be filed in this court pre-award for protester to preserve its challenge, only it must be raised pre-award. ATSC did protest the Army's decisions pre-award, albeit before GAO. The grounds raised before GAO were similar to those raised before this court, except for ATSC's pretext claim. *See, e.g.*, *Palantir Tech. Inc. v. United States*, 128 Fed. Cl. 21, 42 & n.21 (2016); *see also Vanguard Recovery Assistance v.*

The waiver rule generally operates against challenges to the solicitation, against which ATSC makes no challenge. The Federal Circuit has never addressed the applicability of the waiver rule outside the context of a protest to a solicitation. While *COMINT* does state that the "same policy underlying *Blue & Gold* supports its extension to all pre-award situations," 700 F.3d at 1382, as the government argues, Def.'s Reply at 6, the extensive surrounding discussion implicates only solicitation challenges, *see COMINT*, 700 F.3d at 1382 ("[W]e think the reasoning of *Blue & Gold* applies to all situations in which the protesting party had the opportunity to *challenge a solicitation* before the award and failed to do so.") (emphasis added). *Compare Sotera Def. Solutions, Inc. v. United States*, 118 Fed. Cl. 237, 253-57 (2014) (rejecting applicability in this court of GAO's 10-day waiver doctrine as it applies to corrective action protests), *with Synergy Solutions, Inc. v. United States*, 133 Fed. Cl. 716, 736-40 (2017) (accepting a version of GAO's waiver rule as applied to a conceded failure by the procuring agency to conduct discussions during corrective action).

The government cites four cases to support applicability of the waiver rule to ATSC's claim, although only one articulates an expansive version of the waiver rule. In *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698 (2011), CRA protested post-award the Army's failure to address concerns about an alleged conflict of interest. *Id*. at 712-13. The protestor argued both that the Army erred by not amending the solicitation to address potential conflict of interests and that the FAR independently required the Army to mitigate potential conflicts of interest. *Id*. at 712. The court rejected both grounds as waived under *Blue & Gold*, finding that both should have been raised prior to the close of bidding. *Id.* at 712-13. But, no extension of the waiver rule occurred; *CRAssociates* "actually was challenging the terms of the solicitation, rather than the agency's evaluation of proposals." *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 75 (2013) (citing *CRAssociates*, 102 Fed. Cl. at 713); *accord J.C.N. Constr., Inc. v. United States*, 107 Fed. Cl. 503, 516 (2012). Correspondingly, the waiver rule applied by *Concourse Group., LLC v. United States*, 131 Fed. Cl. 26, 29-30 (2017), occurred in a "situation [] quite similar" to that in *CRAssociates*, which did not implicate an agency's evaluation, but rather raised a conflict of interest claim. And, in *QTC Medical Servs., Inc. v. United States*, 132 Fed. Cl. 610, 621-22 (2017), the court applied the waiver rule to claims that challenged the agency's methodology for calculating price and price reasonableness, and to a claim that the agency engaged in misleading discussions. Both grounds represented a challenge to the solicitation, unlike the present case. *Id*. In sum, these cases, like *Blue & Gold* and *COMINT*, involve protests of issues extrinsic to the offerors' proposals.

The case that takes a broader view of *COMINT* and *Blue & Gold* is *Synergy Solutions*, which read *COMINT*'s holding "to expand the reach of the *Blue & Gold* waiver rule to include any defects that could potentially be raised and resolved prior to the contract award." 133 Fed. Cl. at 740. As noted *supra*, *Synergy* applies a version of GAO's waiver doctrine as it applies to corrective action protests. *See id*. at 739. That decision turned in part on GAO's 10-day timeliness rule. *Compare Synergy*, 133 Fed. Cl. at 739, *with Sotera*, 118 Fed. Cl. at 256-57. Here, allowing a protest filed five days after award to proceed does not disregard "the need for

---

*United States*, 99 Fed. Cl. 81, 90 (2011). While the GAO held that the three ATSC claims challenging the Army's evaluation were untimely under its 10-day untimeliness rules, these challenges were nonetheless raised pre-award.

expeditious resolution," the statutory basis for creating the waiver rule.[29]  ATSC's protest, if successful, would neither restart the bidding process nor interrupt a contract execution.  According to ATSC, the relief it requests would at most add ATSC to the pool of contractors eligible to compete for task orders issued under the contract.[30]  The waiver doctrine explicated in *COMINT* and *Blue & Gold* does not bar ATSC's protest given the somewhat unusual setting of this case.

Additionally, laches cannot be applied to bid protests, especially after the Supreme Court's decision in *SCA Hygiene Products*.  *See SCA Hygiene Prods.*, ___ U.S. at ___, 137 S. Ct. at 960-61.  While ATSC may seek equitable relief, Congress has prescribed a statute of limitations for Tucker Act claims.  Proper regard to the need for expeditious relief in bid protests, a statutory requirement, does not give license to truncate the statute of limitations with laches, separate and apart from the *Blue & Gold* waiver doctrine.

## STANDARD OF REVIEW

### A.  *Motion for Judgment on the Administrative Record*

The standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, govern the court's review of a protest of the government's decisions regarding award of a contract.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  Under the APA, a court may set aside a government procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to the traditional balancing test applicable to a grant of equitable relief.  *See PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004); *Hyperion*, 115 Fed. Cl. at 550.

The court may not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977))), but "must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *Id*. (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009)).  The court may overturn the government's

---

[29]A tangentially related decision applies the *Blue & Gold* waiver doctrine to address a situation in which a protester filed a post-award challenge on December 18, 2017 to extensions of contract performance issued by the Department of Education following corrective action.  *See CBE Grp. Inc., v. United States*, 138 Fed. Cl. 230 (2018).  The court ruled that the challenge was untimely on the ground that the challenge was actually to agency action that had occurred years earlier.  As the court put it, "[the protestor] is not challenging the December 2017 account transfers[,] [rather,][i]t is challenging [the Department of] Education['s] authority to issue [extensions] after October 2014."  *Id*. at 237.

[30]Further, under the waiver rule as articulated in *Blue & Gold*, a protestor is immediately on notice of precisely when its time to protest expires; solicitations provide deadlines for the close of bidding.

procurement decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  In conducting the rational basis analysis, the court looks to whether the "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333), and affords "contracting officers . . . discretion upon a broad range of issues . . . in the procurement process," *AgustaWestland N. Am., Inc., v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (quoting *Impresa Construzioni*, 238 F.3d at 1332-33).   Accordingly, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Grp.*, 554 F.3d at 1037.  Relief in protests alleging a violation of regulation or procedure "must show a clear and prejudicial violation." *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333).

## ANALYSIS

ATSC's overarching claim is that the Army's rationale for excluding it from the competitive range was "pretextual" because the non-price ratings "served no purpose."  Pl.'s Reply at 1-2.  ATSC draws that inference from the fact that "every single offeror that timely submitted a final revised proposal . . . [received an award], regardless of their ratings or price." *Id.* at 1.  This broad claim looks to the Army's stated rationale for ATSC's exclusion.  Thus, to test ATSC's primary claim of pretextual action, the court will turn to whether the Army's evaluation of the offers submitted by ATSC and the other offerors show any signs of pretence or lack of foundation.

### A.  *Army's Evaluation of ATSC's Technical Volume*

ATSC argues that the Army erred by rating ATSC's proposal as Marginal under the Technical factor.  Specifically, ATSC argues the weaknesses documented by the Army "were not weaknesses because the proposal complied with the [solicitation] [and] any issues could have been addressed through discussions" that would have occurred if ATSC were included in the competitive range.  Compl. ¶ 40; Pl.'s Mot. at 20-23.  ATSC also suggests that other offerors with similar errors were nevertheless rated Acceptable.  Pl.'s Mot. at 15.  Wholly apart from the allegedly flawed evaluation, ATSC also argues that excluding it from the competitive range based on the Technical factor constituted error.  According to ATSC, the Army relied "on a blanket comparison solely between ATSC's ratings and the ratings of other offerors, without finding that ATSC was technically unacceptable or would not benefit from discussions, and without substantively comparing ATSC to the proposals of other offerors."  Compl. ¶ 42; Pl.'s Mot. at 14-15.

The government defends the propriety of Army's rating of ATSC's Technical Volume emphasizing that "[i]n over 6 pages of narrative, the evaluators found and detailed 23 weaknesses."  Def.'s Cross-Mot. at 28.  The government also argues that ATSC had substantially more weaknesses than other offerors, that "[n]o other offeror had issues with its Risk Management Plan to the extent" of ATSC's plan, and that ATSC's motion only specifically challenged four of the weaknesses identified by the Army's evaluators.  Def.'s Cross-Mot. at 29.

The government contends that ATSC's claims are "mere disagreements" with the Army's evaluations. *Id.* Pinnacle makes similar arguments. *See* Def.-Intervenor's Cross-Mot. at 14-17.

An agency's evaluation of the strengths and weaknesses of offers turns on issues of judgment that the court may review as to the reasoning of the procuring agency, but may not decide as a *de novo* matter. *See COMINT*, 700 F.3d at 1384 (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.")).

The Evaluation Board documented in detail the 23 weaknesses ascribed to ATSC's Technical volume, identifying both the pertinent evaluation requirement and the gap or deficiency in ATSC's proposal. A review of ATSC's Risk Management Plan, AR 11b-2040 to 43, substantiates the Army's finding that ATSC's proposal "simply provided a definition or high level explanation of the requirement rather than relate the [risks] to the activities in the Sample Task Order," AR 16-2857. ATSC argues that other offerors also had weaknesses assigned to their Risk Management Plans. Pl.'s Reply at 12. While true, the other nine offerors had between zero and two weaknesses, but ATSC had 13. Other aspects of ATSC's Technical volume had numerous weaknesses overall. Comparatively, ATSC had more than twice the weaknesses of both C-3's and C-9's Acceptable proposals, which had the next greatest number of weaknesses. The Selection Authority examined the Evaluation Board's report when reaching the competitive range decision, summarizing the Evaluation Board's findings. AR 50-7433 to 34. The Army's Marginal rating of ATSC's Technical proposal, reviewed both independently and as compared to the other offerors' ratings, appears to be both supported by the facts of record and reasonable.

ATSC contends that issues that "could have been addressed through discussions" did not constitute weaknesses or could not constitute the basis for a bad evaluation. *See, e.g.*, Pl.'s Mot. at 22. Many weaknesses can indeed be resolved through discussions, but the FAR expressly permits award without discussions. *E.g.*, FAR § 15.306(a)(3) ("Award may be made without discussions" if the solicitation so states.). Notably also, "[c]ommunications with offerors before establishment of the competitive range . . . shall not be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, and/or otherwise revise the proposal." FAR § 15.306(b) (heading and (3)) (emphasis removed). Further, the FAR only permits discussions with those determined to be within the competitive range. FAR § 15.306(b). The competitive range need not include all offerors; indeed, the purpose is to winnow the number of offerors. FAR § 15.306(c)(1)-(2). Overall, the Army's decision to assign ATSC weaknesses in its Technical proposal and not allow ATSC to resolve them is consistent with procurement regulations.

## B. *Army's Evaluation of ATSC's Past Performance*

ATSC assigns two errors to the Army's consideration of its past performance. First, ATSC contends that the Army viewed the Neutral rating unfavorably, which would contravene procurement regulations, when the Army cited the Neutral Confidence rating in connection with its stated rationale for excluding ATSC from the competitive range. Pl.'s Mot. at 26-27. Second, ATSC contends that the Army erred when it found ATSC's past performance record as "being so sparse that no meaningful confidence assessment rating can reasonably be assigned," thus designating Neutral Confidence. *E.g.*, Compl. ¶ 44 (quoting AR 17-4460). ATSC argues

that having submitted five contracts, each of which was rated recent and relevant and two of which were assessed by the contracting agency, it was unreasonable for the Army to find ATSC's record as sparse. Pl.'s Mot. at 24. ATSC suggests that a comparison of its Past Performance evaluation to those of others, such as Pinnacle's, reveals that the Army preferred CPARs over Past Performance Questionnaires, in violation of the solicitation. Pl.'s Mot. at 25.

The government defends the Neutral Confidence rating of ATSC as proper based on the lack of performance assessments for ATSC's contracts. Def.'s Cross-Mot. at 31. The Army had only two assessments for ATSC, each of which covered a single contract, whereas it had four assessments covering three contracts for Pinnacle. *Id.* at 32. The government also contends that the Army did not violate the FAR by mentioning ATSC's Neutral Confidence rating in its competitive range determination, arguing ATSC was not eliminated because of the rating, but rather because "of all factors as required by FAR [§] 15.306." *Id.* at 34. Pinnacle makes similar arguments, Def.-Intervenor's Cross-Mot. at 18-19, and also notes that two offerors with Neutral Confidence ratings for their revised proposals still received an award, Def.-Intervenor's Cross-Mot. at 17-18 (referring to offerors C-7 and C-8).

An agency must evaluate proposals using criteria intrinsic to the solicitation. FAR § 15.305(a). When past performance is an evaluative factor, the solicitation "shall describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history . . . ." FAR § 15.305(a)(2)(ii). Offerors lacking a record of relevant past performance "may not be evaluated favorably or unfavorably on past performance." FAR § 15.303(a)(2)(iv).

The solicitation required offerors to provide three contracts describing its work and one contract describing work performed by proposed key subcontractors or joint venture partners. In the solicitation, the government stated it would evaluate contracts for recency and relevancy, and in conjunction with both, would "conduct a quality assessment to provide an overall confidence rating." AR 6-920. The Army defined relevancy, as "efforts that are the same as or similar to the effort required by the [solicitation]." AR 6-911. The solicitation also required offerors to request performance assessments from the contracting agency. AR 6-913. The Source Selection Plan was consistent with the FAR in stating that a Neutral Confidence rating could not result in either an unfavorable or favorable past performance evaluation. AR 5b-734; *see also* FAR § 15.305(a)(2) (requirements on evaluating past performance).

The Selection Authority's initial award and the subsequent competitive range decision noted that each offeror with a Neutral Confidence rating "is not evaluated favorably or unfavorably on the factor of past performance." *E.g.*, AR 17-4460; AR 50-7413. The record does not indicate otherwise. During the initial evaluation, four other offerors had Neutral Confidence ratings; three of those four received an initial award and all four later joined the competitive range. Among final awardees, two still had Neutral Confidence ratings. These outcomes rebut ATSC's claim that the Army disfavored a Neutral Confidence rating.

The court views the Army's discussion of ATSC's Past Performance as appropriate. ATSC was factually "in the bottom half of offerors evaluated under [Past Performance]," as the competitive range determination expressed. AR 50-7434. Just as no assessment is better than an unfavorable one, a favorable assessment is better than no assessment. No error occurred in

expressing this intuitive result, a relevant consideration given the factor's importance.  Viewed equally with the Technical factor as the most important factor, favorable Past Performance might compensate for an unfavorable Technical rating.  But in essence, the Army's Neutral Confidence rating for ATSC's Past Performance precluded the Army from using that rating in ATSC's favor, limiting the Army's decision to consideration of Technical, Price, and Small Business Participation.  And what differentiated ATSC's proposals from the others was its Marginal Technical rating.

Turning to the propriety of the Neutral Confidence rating given to ATSC, an "[e]valuation of past performance implicates agency judgment to which the court owes a measure of deference."  *Thoma-Sea Marine Constructors, LLC, v. United States*, ___ Fed. Cl. ___, ___, 2018 WL 6844456, *29 (Jan. 2., 2018) (citing *COMINT Sys. Corp.*, 700 F.3d at 1384 (quoting *E.W. Bliss Co.*, 77 F.3d at 449) ("[T]echnical ratings . . . involve discretionary determinations . . . that a court will not second guess.")); *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 563-65 (2012), *aff'd*, 720 F.3d 901 (Fed. Cir. 2013)); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard applicable [in bid protests] is highly deferential.").

A comparison of the Past Performance ratings exposes some inconsistencies in assigned ratings.  For example, Offeror C-8 and Pinnacle received Neutral and Satisfactory Confidence ratings, respectively, despite what appears to be identical assessments.[31]  C-3 received a lower, though still favorable, confidence rating than either C-1, C-2, or C-5, despite similar or better ratings and more rated contracts.[32]  Nonetheless, these inconsistences do not directly implicate ATSC's Past Performance rating.  Nor are these inconsistencies sufficient to undermine the Army's evaluation of ATSC.

The lack of performance assessments for ATSC would hinder the Army's evaluation of performance quality, a stated component of the confidence rating.  No offeror rated as Satisfactory or better had fewer than three rated contracts and four evaluations.  Contrary to ATSC's claims, *see* Pl.'s Mot. at 25, the record does not demonstrate that CPARs were given more weight than Past Performance Questionnaires.  C-5, C-8, and C-10 all had four assessments pertaining to three contracts, but C-5 had the highest rating despite only having one CPAR

---

[31]*See* the discussion of Past Performance *supra*, at 12-15.  C-8 and Pinnacle both presented three somewhat relevant and one relevant contract.  C-8 and Pinnacle both had four performance assessments covering the three somewhat relevant contracts.  The performance assessments were comparable.  While the record provides a detailed description of each contract, it does not translate individual contract evaluations into the final confidence assessment or make any comparison among different offerors.

[32]*See supra*, at 13 & nn. 13 & 14.  C-2 and C-5 had six and four ratings covering three contracts, C-1 had seven ratings covering four contracts, and C-3 had seven ratings covering four contracts.  One difference, however, is C-2 and C-5 had one and two contracts rated as very relevant whereas all of C-5's were relevant.  All of C-1's contracts were rated as relevant.  Excluding C-3's contracts that lacked a performance assessment, C-1 and C-3 seem to be similarly situated but received different ratings.

compared to two for C-8 and C-10.  ATSC had fewer assessments for fewer contracts than any offeror rated higher than Neutral Confidence.[33]

Comparing ATSC with Pinnacle, a Satisfactory Confidence recipient with the least relevant contracts and fewest evaluations, also fails to appreciably help ATSC.  It was not inherently unreasonable for the Army to decide that two evaluations for two Relevant contracts merits Neutral Confidence while four evaluations for three Somewhat Relevant contracts merits Satisfactory Confidence.  The Army may also delve below the classification of contracts and the number of evaluations when assigning the confidence rating, and given the extensive discussion of each contract submitted, had ample information to do so.

## C. *The Army's Evaluation of ATSC's Small Business Participation Plan*

ATSC also alleges error in the Army's rating of ATSC's Small Business Participation as marginal and its assessment of a significant weakness in ATSC's Small Business Participation volume.  *See* Pl.'s Mot. at 28-31.  ATSC received a significant weakness for including only the first page of its teaming agreements, precluding the Army from "determin[ing] [the] amount of variety and complexity" of work assigned to small businesses.  AR 16-2869.  ATSC contends that it proposed a 100% small business participation rate, of which it would perform 69% of the work, and that the Army accordingly credited it with a significant strength. Therefore, ATSC argues, the amount of variety and complexity work assigned to small business was obvious: 100%.  Pl.'s Mot. at 30.

The government argues that solicitation required teaming agreements, if provided, to "contain a statement of work that defines that work that will be performed by the subcontractor," Def.'s Cross-Mot. at 35-36 (quoting AR 8-1551 (Amendment 0002)), but ATSC failed to comply.  Pinnacle makes a similar argument.  Def.-Intervenor's Cross-Mot. at 20-21.

Evaluation of small business participation implicates agency judgment to which the court owes a measure of deference.  *See Advanced Data Concepts*, 216 F.3d at 1058; *see also COMINT*, 700 F.3d at 1384 (quoting *E.W. Bliss Co.*, 77 F.3d at 449); *Thoma-Sea Marine*, ___ Fed. Cl. at ___, 2018 WL 6844456, at *29.

ATSC did not comply with solicitation requirements regarding teaming agreements.  Its incomplete teaming agreements did not show the amount of variety and complexity of work assigned to small business subcontractors as required by the solicitation.  Notwithstanding the fact that reasonable minds might disagree on the sufficiency of ATSC's compliance with the solicitation, under the applicable standard of review the court cannot say the Army acted unreasonably in assigning ATSC a significant weakness for its incomplete submission.  None of the four initial proposals with Acceptable ratings had any significant weakness.  Thus, the Army's decision to rate ATSC's Small Business proposal as Marginal aligns with the ratings assigned to other offerors.  And, although the solicitation did not require teaming agreements, it

---

[33]Notably, the Redstone Arsenal could have provided either a Past Performance Questionnaire or a CPAR for ATSC but neither was provided or available.  The absence of a CPAR was explained by the relative newness of ATSC's contract.

did specify that if they were provided, they "contain a statement of work that defines [subcontractor] work." AR 16i-4250.[34]

The court further finds ATSC was not prejudiced by any error in evaluating this factor. The solicitation ranked the Small Business Participation factor as the least important factor. AR 16i-4253. Five offerors selected for the competitive range had a Marginal rating under this factor. Even if the court were to find the Army's Small Business Participation rating of ATSC to be unreasonable, ATSC would not necessarily have been prejudicial because of ATSC's ratings on the other factors would have been more important to the end result. *E.g.*, *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 911-12 (Fed. Cir. 2013) ("To prevail in a bid protest case, the protestor must show that it was prejudiced by the government's actions.").

## D. *The Army's Determination of the Competitive Range*

Finally, ATSC argues that the Army's unreasonable evaluation of the Technical, Past Performance, and Small Business Participation factors each caused ATSC's erroneous exclusion from the competitive range. Pl.'s Mot. at 19-20, 23, 28. ATSC contends that the Selection Authority compounded these errors by relying uncritically on "adjectival ratings alone, without meaningfully addressing the substance behind those ratings." *Id*. at 15. Additionally, ATSC argues that notwithstanding such errors, the Army "did not meaningfully consider ATSC's very low price in establishing the competitive range." *Id*. at 16-20. ATSC faults the Army for the lack of explanation on how the Army evaluated whether prices were fair and reasonable, especially considering that all prices were found fair and reasonable despite ranging from $31,359 to $159,345. *Id*. at 16 n.3.

The government counters that the Army properly excluded ATSC from the competitive range because ATSC was not among the most highly rated offerors when considering all factors. Def.'s Cross-Mot. at 21-22. The government argues that ATSC confuses the requirements for a best value tradeoff analysis required for award and the comparative analysis required to establish the competitive range. *Id*. at 23-25. Pinnacle echoes this argument. Def.-Intervenor's Cross-Mot. at 12-14.

A competitive range, when established, "shall [be] comprised of all of the most highly rated proposals," unless reduced to promote efficiency. FAR § 15.306(c)(1)-(2). While an agency must consider price before eliminating an otherwise acceptable proposal, an agency need not include "all technically sound proposals in the competitive range, even if they have a low price." *Red River Comput. Co. v. United States*, 120 Fed. Cl. 227, 239 (2015) (citing *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 731 (2008). "Such a requirement would be contrary to the discretion afforded to the agency in establishing a competitive range . . . ." *Femme Comp*, 83 Fed. Cl. at 731.

---

[34]The court recognizes that C-8 received an Acceptable rating despite having a lower rate of small business participation and self-performance than ATSC and likely not providing teaming agreements. Seven offerors received a significant strength for providing complete teaming agreements while C-8 did not receive a significant strength for this factor.

Having found no error in any of the adjectival ratings assigned to ATSC, the court rejects ATSC's claim that the Selection Authority failed to address the substance behind the ratings when exercising his independent judgment. The Selection Authority "may use reports and analyses prepared by others" when exercising independent judgment regarding selection decisions. FAR § 15.308. The Selection Authority does not need to duplicate the extensive analysis performed by the Evaluation Board, nor document every detail that forms the basis of the selection decision. Evidence of review of the relevant assessments and of a decision consistent with such findings suffices to find the Selection Authority's decision to be coherent and reasonable. For this procurement, the Evaluation Board's report documents the strengths and weaknesses of each proposal for each factor in great detail. The Selection Authority examined the Evaluation Board's analysis when determining the competitive range, expressly stating as much and summarizing the Evaluation Board's findings. It is evident to the court that the Selection Authority understood the basis for the adjectival ratings and for making the competitive range decision.

Regarding the Army's Price evaluation, ATSC did propose the third lowest price, *i.e.*, third lowest cumulative labor rate ceiling, and the lowest among small business offerors.[35] Contrary to ATSC's assertion, the record indicates that the Army did consider ATSC's price, stating that "[ATSC's] [labor] ceiling price was among the lower priced offerors." AR 50-7434. But, as the Selection Authority discussed in the competitive range decision, Price was less important than either of the equally-weighted Technical and Past Performance factors, in which ATSC earned a Marginal and Neutral ratings, respectively. It is neither unreasonable nor contrary to procurement regulations for the Army to find a low-price offer not among the most highly rated due to a Marginal rating in one of the two most important factors.

Neither the fact that ATSC met entry gate criteria nor that ATSC would have benefited from discussions are relevant to a competitive range determination. The competitive range exists to winnow the field of offerors regardless of whether culled offerors could have improved if given the chance. ATSC, primarily due to its Marginal Technical rating that could not be offset by Past Performance, was not among the most highly rated. Thus, the Army could exclude ATSC without regard for whether ATSC could improve this or any other factor.

## CONCLUSION

For the foregoing reasons, ATSC's motion for judgment on the administrative record is DENIED and the government's and Pinnacle's cross-motions for judgment on the administrative record are GRANTED. The clerk shall enter judgment accordingly.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow

---

[35]ATSC's initial price was lower than the final prices proposed by any of the eight awardees, even accounting for the two labor rates missing from ATSC's initial proposal.

Charles F. Lettow
Senior Judge